## Mary D. Pellegrino et al. *v.*
## William A. O'Neill et al.
## (12369)

Peters, Healey, Parskey, Shea and Grillo, Js.

Argued March 2—decision released July 17, 1984

*Wesley W. Horton,* with whom was *Robert M. Shields, Jr.,* for the appellants (plaintiffs).

*Elliot F. Gerson,* deputy attorney general, with whom were *Henry S. Cohn,* assistant attorney general, and, on the brief, *Joseph I. Lieberman,* attorney general, for the appellees (defendants).

SHEA, J. The principal issue ultimately involved in this case is whether the judiciary, in order to implement the constitutional right to justice without delay in the disposition of civil jury cases, may direct the legislature to appoint additional trial judges for that purpose. We conclude that to do so would violate the basic principle of separation of powers and that the issue of whether a violation of that constitutional right is occurring in this state is nonjusticiable.

The plaintiffs have appealed from the dismissal of their complaint in which they claim that inadequate financing of the state judicial system has produced a backlog of civil jury cases in the judicial districts of Hartford, New Haven, Bridgeport and Stamford, which has resulted in a deprivation of their rights both to the administration of justice without delay, as guaranteed by article first, § 10[1] of our Connecticut constitution and to due process of law, as provided both in our state[2] and federal constitutions.[3] In rendering judgment the

---

[1] Article first, § 10 of the Connecticut Constitution provides: "All courts shall be open, and every person, for an injury done him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[2] Article first, § 8 of our state constitution provides in part as follows: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

[3] Amendment fourteen, § 1 of our federal constitution provides in part as follows: "nor shall any State deprive any person of life, liberty or property, without due process of law . . . ."

The plaintiffs have not argued their federal due process claim on any basis different from their state constitutional claims. We note that the right to

trial court concluded that the question of whether the state's financing of the judicial system violated the plaintiffs' constitutional rights because of delay in the disposition of their cases was nonjusticiable. The defendants, in accordance with Practice Book § 3012, have presented for review as an alternate ground for affirming the judgment, their defense of sovereign immunity, which the trial court also considered but rejected.

Because this appeal is from the dismissal of a complaint we must rely wholly upon the facts alleged therein.[4] Each of the thirteen plaintiffs is also a plaintiff in another action pending on the civil jury docket of the Superior Court in the judicial districts of Hartford, New Haven, Bridgeport or Stamford, for periods ranging from approximately six years and eight months to one year and ten months prior to the filing of the complaint on August 26, 1983. The defendants are the governor of the state, the treasurer, the comptroller, the chief court administrator, the speaker of the House of Representatives and the president of the Senate.

The complaint alleges that during the period July 1, 1982 through April 30, 1983, the average time consumed between the filing of a civil jury case and its disposition by judgment after trial varied from five years,

a civil jury trial in a state court has not been deemed so fundamental that it qualifies for protection under the fourteenth amendment to the United States constitution. *Hardware Dealers Mutual Fire Ins. Co.* v. *Glidden Co.,* 284 U.S. 151, 158, 52 S. Ct. 69, 76 L. Ed. 214 (1931).

[4] A motion to dismiss pursuant to Practice Book § 142 may perform the role of either a motion to erase or a plea in abatement under our former practice. See *American Laundry Machinery, Inc.* v. *State,* 190 Conn. 212, 217, 459 A.2d 1031 (1983). Since no affidavits of facts not apparent on the record have been filed in accordance with Practice Book § 143, this motion to dismiss, like a motion to erase, "admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone." *Perrys, Inc.* v. *Waterbury Redevelopment Agency,* 157 Conn. 122, 124, 249 A.2d 256 (1968); *Fairfield Lumber & Supply Co.* v. *Herman,* 139 Conn. 141, 144, 90 A.2d 884 (1952).

nine months and five days in New Haven to four years, nine months and nine days in Bridgeport. The plaintiffs claim further that these delays exceed those to be found anywhere else in this country; that the number of full-time Superior Court judges available for trials in this state is among the very lowest in relation to population of forty-two states with which a comparison has been made; that the per capita income of the 3,153,000 residents of this state was second highest in the nation, but that we rank third from last in expenditures for the judicial department as a percentage of personal income; that the sum appropriated for the operation of the judicial department in the 1982 fiscal year, $49,413,846, was inadequate for the purpose of providing citizens of this state with adequate means of redress for their civil claims without delay.

The prayer for relief seeks a declaratory judgment that the financing of the state judicial system in Connecticut is unconstitutional under our state and federal constitutions because of the delays in the trial of civil jury cases in Hartford, New Haven, Bridgeport and Stamford. Ancillary injunctive or other equitable relief needed to enforce such a declaratory judgment is also requested.

The defendants' motion raised both sovereign immunity and nonjusticiability of the questions presented by the complaint as grounds for dismissal of the action. The trial court, having concluded that the defense of sovereign immunity was inapplicable, relied wholly upon nonjusticiability in granting the motion. Since we agree that the motion was properly granted upon that ground, it is unnecessary for us to consider the question of sovereign immunity.

The trial court granted the motion to dismiss upon the ground that the case was nonjusticiable, i.e., not capable of resolution on the merits by judicial action.

"Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . ; (2) that the interests of the parties be adverse . . . ; (3) that the matter in controversy be capable of being adjudicated by judicial power . . . ; and (4) that the determination of the controversy will result in practical relief to the complainant." *State* v. *Nardini,* 187 Conn. 109, 111–12, 445 A.2d 304 (1982). The defendants have made no claim that the case does not meet the first and second of these requirements for justiciability, actuality of the controversy or adversity of the interests of the parties. They maintain that the third and fourth of these criteria are not satisfied, and the trial court agreed, concluding that the issue of the adequacy of appropriations for the courts was a political question which could not be adjudicated by judicial authority without violating the principle of separation of powers.

The question as framed by the plaintiffs for adjudication by declaratory judgment in this case is whether "the financing of the state judicial system in Connecticut is unconstitutional . . . because of the delays in reaching trial in civil jury cases in Hartford, New Haven, Bridgeport and Stamford." Before the justiciability of this issue is addressed, it is necessary to understand the statutory and constitutional structure underlying the availability of funds for the operation of the judicial department. That department, like other budgeted state agencies, is required to submit annually to designated officials of the executive and legislative branches detailed estimates of anticipated expenditures and revenues for the next fiscal year. General Statutes §§ 4-69 (11), 4-77. These estimates are transmitted in the form of a tentative budget by the secretary of the office of policy and management to the governor. General Statutes § 4-79. After a series of hearings upon the tentative budget, the figures submitted by the agen-

cies may be revised by the governor and incorporated into his proposed budget which is transmitted to the General Assembly. General Statutes §§ 4-80, 4-71. Legislative committees hold hearings on various aspects of the governor's budget proposal, which is published and distributed as a public document. General Statutes §§ 4-76, 4-75. Ultimately the General Assembly must enact appropriation and revenue bills to provide the funds deemed necessary for operation of the state government for the ensuing fiscal year. General Statutes § 4-74. A criminal penalty is provided for any agent of the state who wilfully authorizes or contracts for an expenditure in excess of the amount specifically appropriated by the General Assembly for a particular purpose. General Statutes § 4-100.

"In the establishment of three distinct departments of government the Constitution, by necessary implication, prescribes those limitations and imposes those duties which are essential to the independence of each and to the performance by each of the powers of which it is made the depositary." *McGovern* v. *Mitchell,* 78 Conn. 536, 547, 63 A. 433 (1906). The principle has been widely recognized that the judiciary, as an independent branch of government, has inherent power to direct other governmental agencies to provide such funds as may be necessary for the reasonably efficient operation of the courts. See, e.g., *O'Coin's, Inc.* v. *Treasurer of the County of Worcester,* 362 Mass. 507, 287 N.E.2d 608 (1972); *Commonwealth ex rel. Carroll* v. *Tate,* 442 Pa. 45, 274 A.2d 193, cert. denied, 402 U.S. 974, 91 S. Ct. 1665, 29 L. Ed. 2d 138 (1971); *Zylstra* v. *Piva,* 85 Wash. 2d 743, 539 P.2d 823 (1975); cf. *Ex Parte Peterson,* 253 U.S. 300, 312, 40 S. Ct. 543, 64 L. Ed. 919 (1920); see generally note, "The Courts' Inherent Power To Compel Legislative Funding of Judicial Functions," 81 Mich. L. Rev. 1687 (1983); note, 59 A.L.R. 3d 569 (1974). The duty imposed upon the courts to pro-

vide a constitutionally adequate system of justice capable of securing the rights and liberties of the people cannot be thwarted by a refusal of the legislature to appropriate funds necessary for that purpose. "In the absence of a special appropriation the existence of a law requiring an expenditure to be incurred is an appropriation of money for that purpose, and the law imposes on the comptroller the duty of settling and adjusting demands against the state for such expenses." *State v. Staub,* 61 Conn. 553, 563, 23 A. 924 (1892). A fortiori, the constitutional obligations to provide justice without undue delay and to afford due process of law must be taken to empower the courts charged with that responsibility to have access to the state treasury in an emergency for any funds reasonably necessary for that purpose.

Legislative recognition of the inherent power of the judicial branch to operate an effective system of justice in this state may be found in several statutes. General Statutes § 51-51v authorizes the judges of the Superior Court to appoint clerks as well as such administrative and clerical assistants as the business of the court requires. The state is required to provide such suitable quarters and furniture as are necessary for holding court when there is no suitable location available and to bear the expense thereof, including "whatever other apparatus and supplies are deemed necessary or advisable for the expeditious conduct . . . of the courts." General Statutes § 51-27 (a). General Statutes § 51-27b mandates that "[t]here shall be sufficient offices of the superior court for the efficient operation of the court." The "obligation to furnish convenient places for the holding of the superior court" is imposed on the commissioner of administrative services. General Statutes § 51-27d. It is particularly significant that

General Statutes § 4-84,[5] which provides for the establishment of a contingency fund in each annual budget with a limit which the governor may not ordinarily exceed in approving necessary emergency expenditures, excepts from such limitation any additional funds needed "for current expenses of any state court . . . ." This statute indicates that the judicial department is not to be restricted to amounts specifically appropriated in providing a court system capable of satisfying constitutional obligations.

It is apparent that the question which the plaintiffs pose for adjudication, whether the financing of the state judicial system has been adequate to avoid the unconstitutional delay which is claimed to exist in the disposition of cases on the jury dockets of the more populous judicial districts, is inappropriate and does not as phrased constitute a "substantial question or issue in dispute . . . which requires settlement between the parties." Practice Book § 390 (b). Since the judicial department itself has constitutional authority, which

[5] "[General Statutes] Sec. 4-84. CONTINGENCY APPROPRIATION. The budget as submitted by the governor to the general assembly shall include a recommended appropriation, provided the total amount of individual allotments from such appropriation shall not exceed the total amount of the contingency appropriation for contingencies not to exceed one hundred thousand dollars for the ensuing fiscal year. Wherever an emergency exists and the governor is of the opinion that the necessities of a budgeted agency warrant an increased appropriation or it is necessary to provide for emergency expenditures, he may approve such expenditures as he deems necessary and for the best interest of the public from such contingency appropriation, provided the total amount of individual allotments from such appropriation shall not exceed the total amount of the contingency appropriation as established by the general assembly. Additions to specific appropriations for current expenses of any state court or for current expenses of state institutions or for maintenance of inmates therein or for the reimbursement of towns for relief, support and hospitalization furnished state paupers or for forest fire suppression shall not be considered as within the total appropriation for such contingencies. The governor shall report to the general assembly, not later than the first session day following February fourteenth of each regular session, all increases made by him under authority of this section and the reasons therefor."

the legislature has recognized in the statutory enact-
ments mentioned, to require the proper officials of the
executive department to furnish whatever funds are
needed to operate the courts in a constitutionally ade-
quate manner, whether legislative appropriations have
been sufficient for that purpose is not the central issue
and is virtually an academic question.

The complaint may be construed more broadly, how-
ever, to question the adequacy of the number of judges
whom the legislature has appointed to the Superior
Court. Indeed, this appears to be its basic thrust, as
indicated by the allegations concerning the paucity of
trial judges in Connecticut in relation to population as
compared to other states. Although the number of
judges has obvious implications for funding the courts,
the implied power of the judiciary to obtain sufficient
funds to operate the system in accordance with con-
stitutional requirements has never, heretofore, been
thought to include the authority to increase the num-
ber of judges or to appoint them. The solution to the
problem of delay which the plaintiffs apparently seek
is the creation of additional judgeships. "Yet no advo-
cate of inherent power would argue that judges can
. . . augment their numbers by writs of mandamus."
Hazard, McNamara & Sentilles, "Court Finance and
Unitary Budgeting," 81 Yale L.J. 1286, 1290 (1972).
Increases in the number of judges, as well as appoint-
ments to the additional positions created, are not within
the province of the judiciary. Conn. Const., art. V § 2;
amend. XX § 2. Nor are the defendants, individually
or collectively, empowered to add one judgeship to
those authorized by General Statutes § 51-165 or to
appoint anyone to fill such a position. Those are pre-
rogatives reserved exclusively to the legislature. "Inas-
much therefore as the judicial power of the state is
separated from the legislative and confided to the
courts as a separate magistracy, and the power to orga-

nize courts and appoint judges is conferred by special mandatory provisions, requiring direct action by the General Assembly, those powers cannot be delegated, and the appointment of judges, in all cases where the constitution has not been altered by amendment, can only be made by vote of the Assembly." *Brown* v. *O'Connell,* 36 Conn. 432, 448 (1870).

"The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." Conn. Const., art. II. Just as the exercise of judicial power by the legislature is constitutionally prohibited, so is the legislative power forbidden to the judiciary. *Bridgeport Public Library & Reading Room* v. *Burroughs Home,* 85 Conn. 309, 319, 82 A. 582 (1912); *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 599, 37 A. 1080 (1897); see *Adams* v. *Rubinow,* 157 Conn. 150, 158, 251 A.2d 49 (1968).

"The Constitution has left the performance of many duties in our governmental scheme to depend on the fidelity of the executive and legislative action and, ultimately, on the vigilance of the people in exercising their political rights." *Colegrove* v. *Green,* 328 U.S. 549, 556, 66 S. Ct. 1198, 90 L. Ed. 1432 (1946). The trial court relied upon this principle in concluding that whether jury docket congestion in the Superior Court constituted an unconstitutional denial of justice without delay was a political question not suitable for judicial determination. Although it is widely assumed that the judiciary, as the ultimate arbiter of the meaning of constitutional provisions, must determine every constitutional claim presented and provide appropriate relief, some constitutional commands fall outside the conditions and purposes that circumscribe judicial action. *Colegrove* v. *Green,* supra, 556. The power of Congress

to provide for "disciplining, the Militia" contained in article one, § 8 of our federal constitution is not subject to judicial surveillance. *Gilligan* v. *Morgan,* 413 U.S. 1, 10, 93 S. Ct. 2440, 37 L. Ed. 2d 407 (1973). The obligation imposed by article two, § 3 upon the President to "take Care that the Laws be faithfully executed" cannot be effectuated by a law suit. *Mississippi* v. *Johnson,* 71 U.S. (4 Wall.) 475, 499, 18 L. Ed. 437 (1866). Claims of violations of the guaranty in article IV § 4 of "a Republican Form of Government" to every state have often been held not amenable to a decision by the courts. *Pacific Telephone Co.* v. *Oregon,* 223 U.S. 118, 142, 32 S. Ct. 224, 56 L. Ed. 377 (1912); *Luther* v. *Borden,* 48 U.S. (7 How.) 1, 42–44, 12 L. Ed. 581 (1849). Constitutional questions involving foreign relations, such as the termination of treaties, recognition of foreign governments, and the duration of hostilities have also been refused a determination in the judicial forum. *Baker* v. *Carr,* 369 U.S. 186, 211–14, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). The characterization of such issues as political is a convenient shorthand for declaring that some other branch of government has constitutional authority over the subject matter superior to that of the courts. "The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker* v. *Carr,* supra, 210. "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from mul-

tifarious pronouncements by various departments on one question." *Baker* v. *Carr,* supra, 217.

Of these criteria, the most significant for our decision is the "textually demonstrable constitutional commitment" of the determination of the number and the appointment of judges to the legislature. "The judges of the . . . superior court shall, upon nomination by the governor, be appointed by the general assembly in such manner as shall by law be prescribed." Conn. Const., art. V § 2. The authority to create additional judgeships as well as to designate those to fill them is necessarily included in this grant and also in article third, § 1 which vests "the legislative power of this state" in the senate and house of representatives. It has been suggested that a more complete separation of the legislative, executive and judicial powers might be achieved if each of these branches were wholly independent of the other and responsible directly to the people. The Federalist No. 51 (J. Madison). Their interdependence in certain critical respects is, however, a significant feature of our system of "checks and balances." We must resist the temptation which this case affords to enhance our own constitutional authority by trespassing upon an area clearly reserved as the prerogative of a coordinate branch of government.

We are also persuaded that there is a "lack of judicially discoverable and manageable standards for resolving" the issues presented by the plaintiffs in the sense that no effective relief can be granted by a court "without expressing lack of the respect due coordinate branches of government." *Baker* v. *Carr,* supra, 217. Moreover, although the problem of delay in the trial of civil jury cases might well be relieved by additional judges, whether it should be resolved in that manner or by legislation analogous to our no-fault motor vehicle insurance statutes; General Statutes §§ 38-319 through 38-350; in order to reduce the volume of liti-

gation coming before civil juries is plainly a decision for the General Assembly. See *Gentile* v. *Altermatt,* 169 Conn. 267, 286–94, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976). The plaintiffs do not contend that in fashioning judicial relief a court could order such alternative solutions but focus wholly upon the need for increased judicial personnel to operate the existing system. Although the spectrum of possible responses to the problem has been thus confined, what the plaintiffs demand is still beyond our power to grant.

It is well established that a court cannot mandate performance of a constitutional duty by a legislature, particularly where that duty involves the exercise of discretion necessary to the enactment of legislation, as does the appointment of judges and the establishment of their number. *Wells* v. *Purcell,* 267 Ark. 456, 462, 592 S.W. 2d 100 (1979); *Fergus* v. *Marks,* 321 Ill. 510, 152 N.E. 557 (1926); *Watkins* v. *Watkins,* 2 Md. 341, 356 (1852); *Jones* v. *Freeman,* 193 Okla. 554, 564, 146 P.2d 564 (1944). "[I]n all human contrivances confidence must be reposed somewhere, and . . . under the distribution of powers . . . in our State, it is not given to the judiciary to *compel* action on the part of a co-ordinate branch of the government." *Watkins* v. *Watkins,* supra, 356. That the votes of individual legislators should be subject to direct control by judicial decree, which would be necessary to implement a declaration that court congestion had resulted in a violation of the right to justice without delay, is a proposition we cannot accept.

The plaintiffs contend that the question of unconstitutional delay on the jury docket upon which they seek an adjudication, if considered apart from the matter of appropriate relief, is not textually reserved by our state constitution exclusively for the legislature and satisfies the other criteria for justiciability. They sug-

gest that the trial court should have rendered a declaratory judgment on that issue as presented, leaving the problem of relief for some later proceeding in the event that the legislature should fail to act. Although a similar procedure was approved in *Horton* v. *Meskill,* 172 Conn. 615, 650–51, 376 A.2d 359 (1977), implicit in that decision to stay the hand of the judicial department in order to give the legislative branch an opportunity to solve the problem of unequal educational financing was the assumption that, if necessary, appropriate relief could be fashioned by a court within its constitutional bounds. "Courts sit to determine causes and to enforce their determination. It is a general rule that what they cannot enforce they cannot decree." *Clarke's Appeal from Probate,* 70 Conn. 195, 209, 39 A. 155 (1898). It is not our function to render opinions which are simply advisory. *Reply of the Judges,* 33 Conn. 586 (1867). In *Horton* the court had before it various statutory grants for public schools and it concluded that those legislative provisions for financing education in the state violated the provisions of the Connecticut constitution. *Horton* v. *Meskill,* supra, 650. Rather than enjoin the defendants from implementing the existing statutory financing scheme, the customary remedy in such a situation as sought in one of the prayers for relief, the court chose to defer any such action until the legislature had considered the matter further. Id., 618, 653. The case was clearly one where a judicial remedy could have been applied,[6] although its scope would necessarily be far more limited than a solution which the legislature might devise.

---

[6] The plaintiffs rely upon *Powell* v. *McCormack,* 395 U.S. 486, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969), which found justiciable the issue of whether a congressman, who had been reelected to another term of office despite charges of misconduct, could be excluded from taking his seat as a representative and denied his salary. The court dismissed the declaratory judgment action against those defendants who were legislators, but allowed it to proceed against three employees of the House of Representatives who were involved in enforcing the resolution excluding the plaintiff congress-

In the present case we have concluded that funds are available under the existing statutory framework or by exercise of the inherent power of the Superior Court to enable it, except as limited by the capacity of its present complement of judges, to fulfill its constitutional responsibilities. We have construed the complaint, therefore, to seek an increase in the number of judges available, a remedy which can be achieved only through legislative action. The plaintiffs do not advocate suspension of other court business, such as criminal and nonjury trials, in order to reduce the delay in the disposition of civil jury trials. None of the allegations of the complaint even suggests that existing judicial resources have not been properly allocated. In their brief the plaintiffs commend the action of the chief court administrator in taking appropriate administrative steps to lighten dockets by transferring cases.[7] They also purport to address "only the finance question in this lawsuit because that is the one major facet of the problem that cannot be addressed administratively by the Courts." Neither in their pleadings nor in their brief, however, do the plaintiffs indicate how the declaratory judgment which they seek could be

man from office: the clerk, who had certain duties to perform in seating a representative; the sergeant at arms who would not pay the salary due the plaintiff; and the doorkeeper who would refuse to admit him to the chamber. The possibility of equitable relief against these defendants was not questioned. In the present case we do not perceive, nor have the plaintiffs suggested, any means by which the present defendants can be ordered to provide additional trial judges or to require the legislature to do so.

[7] "Likewise, if judicial resources are not being effectively utilized, the courts can take appropriate administrative steps, such as transferring cases to lighter dockets. This in fact has recently been done by the Chief Court Administrator in certain Hartford cases. The Plaintiffs are addressing only the finance question in this lawsuit because that is the one major facet of the problem that cannot be addressed administratively by the Courts. The Plaintiffs should not be penalized for declining to address those portions of the backlog problem that the courts are capable of resolving on their own. The Plaintiffs will have to prove that increased financing of the judicial system is necessary to avoid unconstitutional delays, but that is a matter of proof foreclosed by the dismissal."

effectively implemented. We find the procedure followed in *Horton* of deciding the substantive issue without contemporaneously formulating appropriate judicial relief to be inapplicable to a situation where it appears that no effective relief by court decree can ultimately be forthcoming.

The plaintiffs are not the first to have called upon the judiciary to remedy the evil of court congestion. *Ad Hoc Committee on Judicial Administration* v. *Massachusetts,* 488 F.2d 1241 (1st Cir. 1973), cert. denied, 416 U.S. 986, 94 S. Ct. 2389, 40 L. Ed. 2d 763 (1974); *De Kosensko* v. *New York,* 311 F. Sup. 126 (S.D. N.Y. 1969), aff'd., 427 F.2d 351 (2d Cir. 1970); *Kail* v. *Rockefeller,* 275 F. Sup. 937 (E.D. N.Y. 1967); *New York State Assn. of Trial Lawyers* v. *Rockefeller,* 267 F. Sup. 148 (S.D. N.Y. 1967). Although the cases cited involved also such questions as the propriety of intervention by the federal courts in the administration of state judicial systems, the opinions uniformly have concluded that the problem of court delay could not be resolved without legislative action and was, therefore, nonjusticiable. "If the only way to eliminate court delay . . . is to provide for more justices, certainly the only way this can be done is by legislative action." *De Kosensko* v. *New York,* supra, 130.

What then will become of the promise extracted from King John at Runnymede and enshrined in the Magna Charta to delay justice to none, which has been incorporated in article first, § 10 of our state constitution? We have declared ourselves unable to respond to its demand in the present context without exceeding our own constitutional authority. The answer must lie in the hearts and minds of the legislators, who are sworn to support the state as well as the federal constitution and to discharge their duties to the best of their abilities. General Statutes § 1-25. More fundamentally, it must rest with the people who elect them.

There is no error.

In this opinion PARSKEY, J., concurred.

ARTHUR H. HEALEY, J., concurring. I agree with the opinion of Justice Shea that the trial court properly granted the motion to dismiss upon the ground that this case was nonjusticiable, i.e., not capable of resolution on the merits by judicial action. I also agree with that opinion's reading and characterization of the issue framed.

Generally, the exercise of the power of the judiciary to review the constitutionality of legislative action does not offend the principle of separation of powers. See, e.g., *Marbury* v. *Madison,* 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803). There are certain powers which our constitution confers upon the legislative branch. The opinion of Justice Shea aptly notes that the matter of the increase "in the number of judges, as well as appointments to the additional positions created, are not within the province of the judiciary." A challenge, therefore, to the legislature's exercise of such a power committed exclusively to that branch generates a nonjusticiable "political question." Professor Wechsler exposed the viscera of the political question doctrine when he wrote that a political question exists when "the Constitution has committed to another [branch] of government the autonomous determination of the issue raised . . . ." Wechsler, "Toward Neutral Principles of Constitutional Law," 73 Harv. L. Rev. 1, 7–8 (1959); see *Powell* v. *McCormack,* 395 U.S. 486, 519–22, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969); *Baker* v. *Carr,* 369 U.S. 186, 211, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962).

The demonstrable text of the Connecticut constitution shows that an increase in the number of judges is committed to a coordinate branch of government and is not within the competency of the judicial branch. No

matter how it may be articulated, pragmatically speaking, that is the bottom line in this matter. In observing the difficulty in determining whether a matter has been exclusively committed by the United States constitution to another branch of government, the *Baker* court said that that determination "is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as [the] ultimate interpreter of the Constitution." *Baker* v. *Carr,* supra; accord *Powell* v. *McCormack,* supra, 519–21. The same responsibility rests with this court as the ultimate interpreter of the Connecticut constitution. A political question, therefore, stands apart from the ordinary deference which courts pay to the other branches of government. To conclude that an issue is within the political question doctrine is not an abdication of judicial responsibility; rather, it is "a recognition that the tools with which a court can work, the data which it can fairly appraise, the conclusions which it can reach as a basis for entering judgments, have limits." *United States* v. *Sisson,* 294 F. Sup. 511, 515 (D. Mass. 1968), appeal dismissed, 399 U.S. 267, 90 S. Ct. 2117, 26 L. Ed. 2d 608 (1970). The result in which I concur does not turn on the novelty or complexity of the issues raised by the plaintiffs, but, rather, it is based upon the recognition that it is a matter outside the ambit of judicial resolution. It is for these reasons that I am able to concur in the result reached in Justice Shea's opinion.

I write separately, however, to disassociate myself from what I perceive as the unnecessary discussion in Justice Shea's opinion of the inherent power of the judicial branch. Harmonious cooperation among the three branches of government is fundamental to our system. Justice Shea's opinion, having concluded that the resolution of the issue in this case is beyond the judicial power, and therefore "nonjusticiable," improvidently discusses the inherent power of the judiciary to fund

its operations properly. The coexistence of coequal branches of government is best promoted by reasoned discussion of only those issues necessary for the disposition of the identified question. In this case, the identified question is whether the plaintiffs' complaint states a justiciable claim. As Justice Shea's opinion concludes, the "basic thrust" of the plaintiffs' complaint concerns the adequacy of the number of judges, an issue which, as that opinion aptly demonstrates, is beyond judicial resolution. Therefore, his elaborate discussion of the inherent power of the judiciary to obtain funds to operate the judicial system effectively is unnecessary for the disposition of the identified question in this case.

Because of the nature of Justice Shea's discussion of the inherent power referred to, I am constrained to comment. My colleagues, including the dissenters, agree with the proposition that courts in this state have inherent power to require that expenditures be incurred to permit the judicial branch to operate an effective system of justice. I am firmly convinced that "[i]t was certainly never intended that any one department, through the exercise of its acknowledged powers, should be able to prevent another department from fulfilling its responsibilities to the people under the Constitution." *O'Coin's, Inc.* v. *Treasurer of County of Worcester,* 362 Mass. 507, 511, 287 N.E.2d 608 (1972).

I believe that the Massachusetts Supreme Judicial Court was sage and politic when it stated: "It has been wisely observed: 'The very conception of inherent power carries with it the implication that its use is for occasions not provided for by established methods. . . . [Only when established] methods fail and the court shall determine that by observing them the assistance necessary for the due and effective exercise of its own functions cannot be had, or when an emergency arises which the established methods cannot or do not instantly

meet, then and not till then does occasion arise for the exercise of the inherent power.' *State ex rel. Hillis* v. *Sullivan,* 48 Mont. 320, 329 [137 P. 392 (1913)]. See *Wayne Circuit Judges* v. *Wayne County,* 383 Mich. 10, 39, 42–44, [172 N.W.2d 436 (1969)] (separate opinion by Adams, J.); *Leahey* v. *Farrell,* 362 Pa. 52, 59–60 [66 A.2d 577 (1949)]." *O'Coin's, Inc.* v. *Treasurer of County of Worcester,* supra, 516.

In sum, I reiterate that the elaborate discussion of the inherent power of the judiciary to fund its operations is unnecessary to the result reached in Justice Shea's opinion. I therefore concur in the result.

PETERS, J., with whom GRILLO, J., joins, dissenting. I disagree with the majority's formulation of the principal issue that confronts us in this case, and with its resolution of the question of justiciability. I must, therefore, dissent. In brief, it is my view that the plaintiffs should not be deprived of the opportunity that was afforded to the plaintiffs in *Horton* v. *Meskill,* 172 Conn. 615, 376 A.2d 359 (1977), to make an evidentiary showing that the legislature has violated the state constitution in failing to appropriate sufficient funds for the constitutionally mandated judicial business of this state. I can discern no principled basis for a procedural distinction between a constitutional challenge to legislative underfinancing that is premised, on the one hand, on the right to free public education; Conn. Const., art. VIII § 1; and, on the other hand, on the right to adjudication of civil cases "without sale, denial or delay." Conn. Const., art. I § 10.

This court has not had the occasion to establish definitively the extent to which article first, § 10, confers an enforceable right of access to the courts for the redress of civil grievances. Recently, however, we looked to this provision when we declared unconstitutional, under our equal protection clause, a legislative act limiting gov-

ernmental tort liability when that legislation lacked a rational basis. *Ryskiewicz* v. *New Britain,* 193 Conn. 589, 601, 479 A.2d 793 (1984). We have also held that this provision imposes a constitutional requirement that when the legislature revises common law rights it must provide injured claimants with reasonable alternative remedies. *Gentile* v. *Altermatt,* 169 Conn. 267, 282–87, 292–94, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976). See *McDonald* v. *Haynes Medical Laboratory, Inc.,* 192 Conn. 327, 334–35, 471 A.2d 646 (1984) (*Speziale, C. J.,* concurring). These cases illustrate our continued recognition of the fact that article first, § 10, which dates from the constitution of 1818, affords a constitutional right to judicial redress of civil grievances. *State* v. *Perkins,* 88 Conn. 360, 368, 91 A. 265 (1914). It is therefore beyond dispute that the plaintiffs herein have a constitutional basis for the claims which they are attempting to pursue. Indeed, the plurality opinion itself concludes that courts, pursuant to their constitutional obligation to provide a constitutionally adequate system of justice without undue delay, have the power to command access to the state treasury for any funds reasonably necessary for that purpose.

The majority nonetheless holds that the plaintiffs have not stated a justiciable claim because they have not stated a "substantial question or issue in dispute . . . which requires settlement between the parties." Practice Book § 390 (b). On the one hand, according to the majority, the constitutional authority of the judiciary to have recourse to the state treasury "to furnish whatever funds are needed to operate the courts in a constitutionally adequate manner" means that insufficient legislative appropriations cannot be the cause of delay in civil jury trials. On the other hand, the basic thrust of the complaint, according to the majority, must be taken to be a request for a court order

to increase the number of judges or to appoint them, and such an order is outside of the scope of the province of the judiciary. The plaintiffs therefore cannot prevail, either because the remedy they seek is not needed or because it is entirely unavailable. My view is in the nature of a plea in avoidance. I do not believe that the plaintiffs are foreclosed from challenging the insufficiency of legislative appropriations nor do I read their complaint as necessarily limited to the appointment of additional judges. I will take up these two matters in reverse order.

I do not understand how the plaintiffs' complaint can be construed, at this stage of the proceedings, to seek only one form of relief. While their complaint does refer to the small number of Connecticut judges in relation to the population of this state, it also addresses the disparity between the state's resources and the state's overall expenditures for the operation of the judicial department. The plaintiffs' prayer for relief broadly seeks: "1. A declaratory judgment that the financing of the state judicial system in Connecticut is unconstitutional under Article First, § 10 of the Connecticut Constitution and Article XIV, Section 1 of the United States Constitution, because of the delays in reaching trial in civil jury cases in Hartford, New Haven, Bridgeport and Stamford. 2. Ancillary injunctive or other equitable relief as needed to enforce compliance with any declaratory judgment which the Court may issue."

It is indisputable that, in ruling whether a complaint survives a motion to dismiss, a court must "take the facts to be those alleged in the . . . complaint construed in a manner most favorable to the pleader." *Amodio* v. *Cunningham,* 182 Conn. 80, 82, 438 A.2d 6 (1980); *Alarm Applications Co.* v. *Simsbury Volunteer Fire Co.,* 179 Conn. 541, 545, 427 A.2d 822 (1980); *Sheets* v. *Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 472, 427 A.2d 385 (1980). "For purposes of appeal, all

well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted." *Amodio* v. *Cunningham,* supra, 83. Furthermore, where, as here, the plaintiffs' prayer for relief seeks not only a declaratory judgment but also general equitable relief, the plaintiffs are entitled to invoke "the long arm of equity" to receive whatever relief "the court may from the nature of the case deem proper. Any relief can be granted under the general prayer which is consistent with the case stated in the complaint and is supported by the proof 'provided the defendant will not be surprised or prejudiced thereby.' " *Cottrell* v. *Cottrell,* 106 Conn. 411, 419–20, 138 A. 458 (1927), quoting 1 Whitehouse, Equity Practice (1915 Ed.) § 119, p. 223; *Balzano* v. *Balzano,* 135 Conn. 584, 590, 67 A.2d 409 (1949). In sum, at least when there is a prayer for general equitable relief, it is the law in our courts, as it is in the federal courts, that "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon* v. *King & Spalding,* 467 U.S. , 104 S. Ct. 2229, 2233, 81 L. Ed. 2d 59 (1984).

The fact that the plaintiffs' claims raise novel and complex constitutional questions is not a reason for strict construction of their complaint. The path we should pursue, in such cases, is precisely the opposite. "[T]he more extreme or even far-fetched is the asserted theory of liability, the more important it is that the conceptual legal theories be explored and assayed in the light of actual facts, not a pleader's supposition." *Shull* v. *Pilot Life Ins. Co.,* 313 F.2d 445, 447 (5th Cir. 1963); *Dart Drug Corporation* v. *Corning Glass Works,* 480 F. Sup. 1091, 1098, n.10 (D. Md. 1979). The delicacy of the political balances that are at stake in the resolution of the question of justiciability; *Immigration and Naturalization Service* v. *Chadha,* 462 U.S. 919, 103 S. Ct. 2764, 2778–80, 77 L. Ed.2d 317 (1983); *State* v.

*Nardini,* 187 Conn. 109, 112, 445 A.2d 304 (1982); adds further weight to this caution against prejudging issues in the abstract. After a full hearing, the trial court and this court would be much better advised about whether "the matter in controversy [is] capable of being adjudicated by judicial power . . . and [whether] determination of the controversy will result in practical relief to the complainant." *State* v. *Nardini,* supra. Jurisprudential prudence counsels us to await the evidence before we dismiss this complaint.

An exceptionally strict construction of the plaintiffs' complaint might be explicable, although not justified, by the exigency of having to confront an awkward, if not unseemly, inquiry into the power of the judiciary to order the appropriation of funds for its own functioning. Justice Shea and Justice Parskey, however, concede that courts in this state have inherent power to require expenditures to be incurred to permit the judicial branch of government to operate an effective system of justice. I agree with that proposition. Although we acknowledged, in *Eielson* v. *Parker,* 179 Conn. 552, 560, 427 A.2d 814 (1980), that the legislature has the power to appropriate funds to finance the operation of all of the state's programs, including that of the judicial department, we did not there hold that all appropriation matters are exclusively and unreviewably vested in the legislative branch. Cf. *Kinsella* v. *Jaekle,* 192 Conn. 704, 723–30, 475 A.2d 243 (1984).

I would have thought that recognition of the judiciary's inherent power to respond to fiscal constraints that engender unconstitutional delays in the resolution of civil cases would have been a basis for sustaining the validity of the plaintiffs' complaint. We are free to consider this matter unencumbered by the considerations of federalism which have led federal courts to doubt the propriety of *federal* intervention in the administration of *state* judicial systems. See *Ad Hoc Commit-*

*tee on Judicial Administration* v. *Massachusetts,* 488 F.2d 1241, 1245–46 (1st Cir. 1973), cert. denied, 416 U.S. 986, 94 S. Ct. 2389, 40 L. Ed. 2d 763 (1974); *De Kosensko* v. *New York,* 311 F. Sup. 126, 129 (S.D. N.Y. 1969), aff'd, 427 F.2d 351 (2d Cir. 1970); *Kail* v. *Rockefeller,* 275 F. Sup. 937, 940–42 (E.D. N.Y. 1967); *New York State Assn. of Trial Lawyers* v. *Rockefeller,* 267 F. Sup. 148, 151 (S.D. N.Y. 1967).

The plurality's holding to the contrary is based upon its conclusion that the judicial department itself has unlimited authority to require the proper officials to furnish whatever funds are needed, whether or not the legislature has seen fit to make the necessary appropriations. On this reasoning, the failure of the legislature to act is not the source of the constitutional harm which the plaintiffs claim to have suffered. With deference, this holding seems to me to fly in the face of political reality. Without a judgment that the current level of legislatively approved funding is constitutionally inadequate, which only a court can render, the judicial department's access to unappropriated funds can hardly operate as more than a stopgap device to deal with emergencies that are both finite and acute. Administrative relief is not a likely remedy for systemic underfinancing. Even if I were wrong in this assessment, however, the plaintiff's complaint should still be viable, since the chief court administrator is one of the named defendants. If the fault were to lie in the failure of the judicial department aggressively to pursue unappropriated but needed funds, that fault should therefore be cognizable within the ancillary prayer for relief in this litigation.

As in *Horton* v. *Meskill,* supra, 650–51, I believe that the plaintiffs may pursue declaratory and equitable relief to vindicate their constitutional right to timely adjudication of their civil claims. I would afford them the opportunity to establish, at trial, that there are pro-

grams which, with additional judicial financing, will relieve the civil jury logjam in our courts. This record does not establish why the legislature has failed to take the remedial action to which the plaintiffs claim they are constitutionally entitled. Whatever the reasons may be, legislative inaction does not, to my mind, relieve this court of its independent duty to vindicate the constitutional rights of those who appear before us.