[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANTS' MOTION TO DISMISS DATEDAPRIL 13, 1995
Pursuant to a January 5, 1995 class action complaint, plaintiffs have filed suit alleging in substance that minimally adequate legal representation is not being provided to various categories of indigent defendants in criminal cases due to high case loads and lack of sufficient resources.
Plaintiffs, alleging a variety of statutory and constitutional violations, under both state and federal law,[1]
CT Page 8040 have moved for class certification pursuant to a motion not addressed in this memorandum of decision on behalf of indigent defendants whose cases have been brought in the Geographical Area (G.A.) courts, the Judicial District (J.D.) courts, the juvenile courts, and on behalf of convicted prisoners who have filed habeas corpus claims.
Defendants — the Governor, the Public Defender Services Commission, and the members of the commission, sued in their official capacities — have moved pursuant to Practice Book Sections 142 et seq. to dismiss the complaint in a Motion to Dismiss dated April 13, 1995 in which it is claimed that the Court lacks subject matter jurisdiction over this case. Plaintiffs oppose the motion.
The parties have filed numerous supplemental and supporting memoranda and affidavits in connection with the motion to dismiss addressing the issues raised in light of past precedents as well as recent reported decisions in Connecticut and elsewhere. Extensive oral argument was held on the Motion to Dismiss on August 5, 1996. Following argument, the Court ordered the parties to file additional supplemental briefs, addressing certain legal issues which required further analysis. These additional memoranda have been received and reviewed.[2] For the reasons stated below, the motion to dismiss is denied.
Legal Discussion
The defendants make two fundamental arguments in support of their motion to dismiss, raising important and legitimate concerns.
First, they argue that the case should be dismissed due to the doctrine of sovereign immunity, which prohibits certain legal claims against the state from being pursued.
Second, they argue that the case should be dismissed because it is not justiciable. In substance, defendants' nonjusticiability argument contains three separate prongs. First, defendants argue that the named defendants can afford the plaintiffs no relief. Second, defendants argue that the separation of powers doctrine prevents the court from ordering the relief requested. Third, defendants argue that none of the plaintiffs' claims are ripe for review in the absence of CT Page 8041 alleging and proving "injury-in-fact" or "actual harm." These arguments will now be discussed.
A. Sovereign Immunity.
Defendants correctly cite numerous cases for the undisputed proposition that the state generally cannot be sued without its consent. Barde v. Board of Trustees, 207 Conn. 59,64 (1988). They also concede that certain exceptions to the doctrine of sovereign immunity have evolved over the years, including cases involving claims for declaratory or injunctive relief based on an allegation that a state official has acted in an unconstitutional manner. Sentner v. Board ofTrustees, 184 Conn. 339, 343 (1981). ("In a constitutional democracy sovereign immunity must relax its bar when suits against the government complaint of unconstitutional acts.") Because of the manner in which the complaint has been pleaded, defendants argue, this case does not fall within any exception to the general rule barring actions against the state. Defendants rely upon a lengthy discussion of, and attempted refutation of, some of the statistics relied upon in the complaint in support of their argument,[3] which plaintiffs have in turn attempted to refute. The Court does not find defendants' argument persuasive.
An enlightening discussion of the genesis of the doctrine of "sovereign immunity" is made by Justice Cotter in Textron,Inc. v. Wood, 167 Conn. 334, 340 (1974), in which he states:
 Rooted in the ancient common law, the doctrine of sovereign immunity from suit was originally premised on the monarchical, semi-religious tenet that "the King can do no wrong." Borchard, "Government Liability in Tort," 34 Yale L.J. 1, 2. In modern times, it is more often explained as a rule of social policy, which protects the state from burdensome interference with the performance of its governmental functions and preserves its control over state funds, property, and instrumentalities.
Where a substantial claim is put forth that parties acting pursuant to state authority are acting CT Page 8042 unconstitutionally, sovereign immunity does not require dismissal. Antinerella v. Rioux, 229 Conn. 479, 487-88
(1994); Does v. Heintz, 204 Conn. 17, 31 (1987); Duguay v.Hopkins, 191 Conn. 222, (1983). The complaint in this case alleges in part that the named defendants are acting unconstitutionally, pursuant to both state and federal law, in numerous respects. This court must consider the pleadings "`broadly and realistically'" in ruling on the pending motion to dismiss, Beaudoin v. Town Oil Co., 207 Conn. 575, 588
(1988). As noted in Horton v. Meskill, 172 Conn. at 624-25, quoting Block, "Suits Against Government Officers and the Sovereign Immunity Doctrine," 59 Harv. L. Rev., 1060, 1080:
 In those cases in which it is alleged that the defendant officer is proceeding under an unconstitutional statute or in excess of his statutory authority, the interest in the protection of the plaintiff's right to be free from the consequences of such action outweighs the interest served by the sovereign immunity doctrine. Moreover, the government cannot justifiably claim interference with its functions when the acts complained of are unconstitutional or unauthorized by statute.
In rejecting a claim of sovereign immunity, the court inHorton v. Meskill noted the many occasions when it had considered the merits of appeals from judgments in actions in which state officials had been parties. Id. at 625-26. The court further noted that while the doctrine of sovereign immunity is deeply rooted in our common law, "it has, nevertheless, been modified and adapted to the American concept of constitutional government where the source of governmental power and authority is not vested by divine right in a ruler but rests in the people themselves who have adopted constitutions creating governments with defined and limited powers and courts to interpret these basic laws." Id. at 623. The court decided that a holding to the contrary "would foreclose proper judicial determination of a significant and substantial constitutional question the determination of which is manifestly in the public interest." Id. at 628. Mindful "of the proper limits on judicial intervention," see Horton v.Meskill at 627, I conclude that the principles set out in that CT Page 8043 seminal case and other cases cited by plaintiffs militate against dismissing this case on grounds of sovereign immunity in light of the significant constitutional questions raised in the complaint, the determination of which is manifestly in the public interest.
B. Justiciability
Defendants put forth a number of claims in support of their argument that this case is nonjusticiable.
As defendants point out, "Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . .; (2) that the interests of the parties be adverse . . . ; (3) that the matter in controversy be capable of being adjudicated by judicial power . . .; and (4) that the determination of the controversy will result in practical relief to the complainant." Pellegrio v. O'Neill,193 Conn. 670, 674 (1984), quoting State v. Nardini, 187 Conn. 109,111-12 (1982). Defendants note that courts apply the principles of nonjusticiability on a "case-by-case inquiry."Baker v. Carr, 369 U.S. 186, 210-11 (1962); Nielsen v.Kezer, 232 Conn. 65, 75 (1995).
Defendants' claims of nonjusticiability will now be discussed.
1. Claimed Inability of Named Defendants to AffordPlaintiffs Relief.
Defendants claim that neither the Governor nor the Public Defender Services Commission can afford the plaintiffs the relief they seek. The Court disagrees.[4]
As noted, the complaint requests, inter alia,
the issuance of preliminary and permanent injunctions requiring defendants to provide a statewide public defender system which will guarantee minimal protection of the constitutional rights of accused indigents.
Taken collectively, the named defendants — sued in their official capacities — are among those principally responsible for supervising the functions of government being challenged in the complaint. The Governor is constitutionally obligated to "take care that the laws be faithfully executed," CT Page 8044 Connecticut Constitution, Article Fourth, Section 12, and is also authorized by statute to "investigate into, and take proper action concerning, any matter involving the enforcement of the laws of the state and the protection of its citizens." Connecticut General Statutes, Section 3-1. As a practical matter, litigation of this kind, in Connecticut and other states, as well as in a federal forum, frequently involves named defendants who are public officials at the local, state or federal level. See, e.g., Sheff v. O'Neill, 238 Conn. 1
(1996); New York State Ass'n for Retarded Children v. Carey,631 F.2d 162 (2d Cir. 1980). Foe v. Cuomo, 700 F. Sup. 107
(E.D.N.Y. 1988); and Marisol A. v. Giuliani, 929 F. Sup. 660
(S.D.N.Y. 1996). As plaintiffs point out, legislators are generally immune from civil lawsuits seeking injunctive relief. In litigation seeking systemic or institutional reform, public officials are often the only appropriate defendants given their significant positions of public trust and responsibility.
The Public Defender Services Commission is also charged, by statute, with significant responsibility for overseeing the public defender system. See General Statutes Section 51-289, referenced in the endnotes, including but not limited to Section 51-289 (g), which states that the commission "shall appoint . . . as many assistant public defenders and deputy assistant public defenders for the superior court as the criminal or delinquency business of the court may require." See also General Statutes Section 51-293, which states that the commission "shall appoint . . . as many assistant public defenders and deputy assistant public defenders for the superior court as the criminal or delinquency business of the court may require."
The fact that a court-ordered remedy could eventually require the expenditure of funds does not render the case nonjusticiable. Gaines v. Manson, 194 Conn. 510, 529 n. 18 (1984); Pellegrino v. O'Neill, 193 Conn. 670, 675-6 (1984);Tondro v. Ward, 565 F.2d 48, 54 n. 8 (2d Cir. 1977). If that were the case, then, as a practical matter, lawsuits such as the instant one raising important systemic concerns of constitutional magnitude could seldom if ever be brought.
2. The Claim that the Separation of Powers Prevents theCourt from Ordering the Injunctive Relief Requested.
CT Page 8045
Defendants also claim that pursuant to the separation of powers doctrine, the court is prevented from ordering the relief requested.[5] The defendants' position is essentially that this case is nonjusticiable because it presents political questions the resolution of which will place the courts in conflict with co-equal branches. This is because, defendants argue, any meaningful remedy will require an order requiring the expenditure of more money on the public defender system. This properly lies within the province of the other branches of government, not the judiciary, contend the defendants. In support of this argument, the state relies on numerous cases, including Baker v. Carr, Pellegrino v. O'Neill,Nielsen v. Kezer and other authorities. This argument is unpersuasive calls for an unduly expansive application of the separation of powers doctrine in light of controlling precedents.
It is of course essential to the functioning of our government that each coordinate branch have the utmost respect for the prerogatives of the others and not unduly encroach on these prerogatives. But the caselaw makes it clear that the arising separation of powers doctrine does not require judicial forbearance unless what is at issue is clearly delegated to a coordinate branch, as was the case, for example, inPellegrino.
In Nielsen v. Kezer, Justice Palmer provided a cogent discussion of the question of when a court should appropriately decline jurisdiction because a case raises political questions the resolution of which is beyond the court's authority in light of important and sensitive separation of powers concerns. Citing Baker v. Carr, he noted that a case-by-case analysis was required, and that "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment to a coordinate political department," among other things. Nielsen v. Kezer, 232 Conn. at 75. In the recent case of Sheff v. O'Neill, 238 Conn. 1 (1996), in response to the State's claim that the issues in the case were nonjusticiable, Chief Justice Peters observed that: "In the absence of a textual reservation, however, it is the role and the duty of the judiciary to determine whether the legislature has fulfilled its affirmative obligations within constitutional principles." In this case, notwithstanding defendants' claims, there is no "textually demonstrable CT Page 8046 commitment" of the disputed issues to a coordinate branch of government. Moreover, the important claims being made in this case, relating to the quality of representation being provided to indigent defendants in our state, make this a matter of peculiar concern to the judicial branch.
3. The Claim that the Case Must be Dismissed Because TheComplaint Fails to Adequately Allege "Injury-In-Fact" or"Actual Harm."
Defendants argue that the complaint must be dismissed because plaintiffs have failed sufficiently to allege "injury-in-fact" or "actual harm", relying on numerous cases, including Lewis v.Casey, ___ U.S. ___, 64 U.S.L.W. 4587 (June 24, 1996), andWashington v. Meachum, 238 Conn. 692 (1996). This argument is unconvincing.
As plaintiffs note, because a party must have standing to invoke the subject matter jurisdiction of the court, it is appropriate for a court to evaluate whether a party has made a "colorable claim" of injury when a motion to dismiss pursuant to Practice Book Section 143 is made. Sadloski v.Manchester, 228 Conn. 79, 83-84 (1984). As our Supreme Court stated in Maloney v. Pac, 183 Conn. 313, 321 (1981):
 Standing is not a technical rule intended to keep aggrieved parties out of court. Rather, it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented.
This limited inquiry into standing should not become an inquiry into the merits in the early stages of a case. The pleading requirements for injury necessary to establish standing sufficient to survive a motion to dismiss are not onerous. Gay and Lesbian Law Students Assn. v. Board ofTrustees, 236 Conn. 453, 463-64 (1996); Maloney v.Pac, 183 Conn. at 321. "The requirements of justiciability and controversy are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity." Gay and Lesbian Students Assn. v.CT Page 8047Board of Trustees, 236 Conn. 453, 463-64. See also Lujan v.Defenders of Wildlife, cited in Lewis v. Casey.
To establish standing in a case for injunctive relief, plaintiffs do not necessarily need to allege that they have already suffered harm as they would be required to do in other types of cases, but rather that they are at imminent risk of harm if the court does not grant the relief requested. Luckeyv. Harris, 860 F.2d 1012, 1017 (11th Cir. 1988), certdenied, 493 U.S. 957 (1990); Riley v. Jeffes,777 F.2d 143, 147 (3d Cir. 1985). In cases involving alleged deprivations of constitutional rights, such as the instant one, the element of injury may be established by alleging the deprivation of the right itself. Windham Taxpayers Assn. v. Board of Selectmen,234 Conn. 513, 526 (1995); Reitzer v. Board of Trustees,2 Conn. App. 196, 201 (1984).
Moreover, Rules 108 and 109 of the Practice Book do not require that every fact be specifically pleaded. Rather, the requirement is that each pleading "contain a plain and concise statement of the material facts on which the pleader relies" so as to "fairly . . . apprise the adverse party of the state of the facts" which plaintiff intends to prove. As already noted, our Supreme Court has repeatedly cautioned that allegations of harm should be viewed "broadly and realistically," not through the narrow lens of archaic and abstract pleading rules. Normand Josef Enterprises, Inc. v.Connecticut National Bank, 230 Conn. 486, 496 (1994). The complaint must be read in its entirety in such a way as to "give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties." Dornfried v. October Twenty-Four, Inc.,230 Conn. 622, 629 (1994). As long as a complaint sufficiently alleges facts to state a cause of action and avoid surprise or unfairness, it will generally be considered sufficiently well-pled.
In this case, considering the nature of the allegations in light of Connecticut's pleading requirements, I conclude that defendants' argument lacks merit. Specifically, Paragraphs 61 through 74 of the complaint read as follows:
F. HARMS TO PLAINTIFF CLASSES
61. The effects of these extreme caseloads CT Page 8048 and inadequate resources on the quality of legal representation are pervasive, and harm plaintiffs and members of their class at every stage of their criminal case. Public defenders are not able to spend adequate time interviewing their clients, counselling their clients, or even explaining the basic information to their clients about the upcoming court proceedings. Forced excessive caseloads and inadequate resources prevent public defenders from spending adequate time reviewing each client's file, conducting necessary legal research, conducting necessary fact investigation and witness preparation, pursuing motions for speedy trials, preparing for trial, filing certain pretrial motions and exploring pretrial alternatives to incarceration as well as sentencing options.
 62. Indigent criminal defense services function without regard for, and in violation of accepted minimum standards for training, workload, and resources including those promulgated by the American Bar Association, the National Study Commission on Defense Services, the National Legal Aid and Defender Association, and the National Advisory Commission on Criminal Justice Standards and Goals.
 63. Excessive caseloads and inadequate resources have caused high stress, low staff morale, and burnout. Because the numbers of attorneys are insufficient, there are no mechanisms for relief when staff is overburdened.
 64. Excessive caseloads have also caused mistrust among plaintiffs and members of their class regarding the adequacy of their public defenders. In part, because weeks or months go by without contact from their attorneys, many indigent criminal defendants develop an understandable lack of confidence in the public defender's office.
 65. According to the 1993 Annual Report of the Chief Public Defender, "the increasing difficulty public defenders are having in keeping up with the CT Page 8049 constantly excessive and serous caseloads," has caused a "slowdown in the public defender's ability to resolve cases expeditiously leading to increased court delays and exacerbating the prison overcrowding problem by prolonging the pretrial incarceration of accused persons who cannot make bail." (p. 7)
 66. Overwhelming caseloads substantially contribute to the fact that virtually all cases "plead out." In the G.A.'s there were only 0.1% or 64 out of 55,767 of all cases disposed in FY 1992-93 in which a jury trial was initiated. For a similar period in the J.D. offices, in only 89 of 1,894 or 4.5% of all cases disposed was a jury trial initiated. In 1993-94, 0.1% or 59 out of 50,483 cases in the G.A. courts and 3.9% or 76 out of 1,903 cases in the J.D. courts began in jury trial.
 67. Indigent criminal defendants in the state court system are not afforded criminal process and representation substantially similar to that afforded criminal defendants of means.
For the above reasons, I conclude that the complaint sufficiently alleges "injury-in-fact" or "actual harm" for purposes of withstanding the pending motion to dismiss. Whether these allegations will be proven at trial is a question for another day.
Summary and Conclusion
The defendants have raised important concerns in their motion to dismiss. However, given controlling precedents and the issues raised in the complaint, I have concluded that this case ought not to be dismissed at this early stage. Without in any way reaching the merits of plaintiffs' claims, for the reasons stated above, defendants' motion to dismiss is denied.
Douglas S. Lavine Judge, Superior Court
ENDNOTES
CT Page 8050