## ROBERT FROMER *v.* BOYER-NAPERT PARTNERSHIP ET AL.

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE No. 509836
NEW LONDON

Memorandum filed November 19, 1990

*Robert Fromer,* pro se, the plaintiff.

*Pavetti & Freeman,* for the named defendant.

*Ramona DeSalvo Dittman, P.C.,* for the defendant town of Waterford et al.

BURNS, J. The plaintiff in this matter is appealing a decision of the Waterford conservation commission (commission) granting a permit to the defendant Boyer-Napert Partnership to conduct a regulated activity on premises known as 166-166R Parkway South in Waterford. The plaintiff, who had filed a notice of intervention pursuant to § 22a-19 (a) of the General Statutes at the hearing conducted by the commission, has standing to prosecute this appeal. *Red Hill Coalition, Inc.* v. *Conservation Commission,* 212 Conn. 710, 715, 563 A.2d 1339 (1989). Such intervening party may raise only environmental issues. Id. The plaintiff appeared pro se at the commission hearing as well as on the present appeal. The commission is the duly appointed agency of the town of Waterford exercising the powers of an inland wetland agency.

General Statutes § 22a-19 (a) allows such intervention upon an assertion by a verified pleading that the proposed activity "involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state."

Inland wetlands and watercourses constitute a "natural resource." General Statutes § 22a-36. In proceedings that may affect inland wetlands, the commission is limited to considering environmental matters that impact inland wetlands. *Connecticut Fund for the Environment, Inc.* v. *Stamford,* 192 Conn. 247, 250, 470 A.2d 1214 (1984). In an appeal from such decision, however, an appellant who has standing may appeal any issue relevant to the question of whether the commission acted illegally. Id., 251 n.3; *Hotchkiss Grove Assn., Inc.* v. *Water Resources Commission,* 161 Conn. 50, 56, 282 A.2d 890 (1971).

Section 22a-19 (b) requires the commission to consider whether the proposed project does or is likely to cause unreasonable pollution, impairment or destruction of the wetland or watercourse affected or destroying the public trust in the air, water or other natural resources of the state. Whether the proposed activity is "reasonably likely to have, the effect of unreasonably polluting, impairing or destroying" is a question of fact for the commission. *Mystic Marinelife Aquarium, Inc.* v. *Gill,* 175 Conn. 483, 503, 400 A.2d 726 (1978). If the commission does make that finding of fact, then no conduct may be authorized or approved as long as "there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare." General Statutes § 22a-19 (b). Absent such a finding of fact by the commission, the subsequent provisions of subsection (b) do not come into play.

It should be noted that, even if the commission does not make the factual determination under § 22a-19 (b), it may impose "such terms, conditions, limitations or modifications of the regulated activity, designed to carry out the policy of sections 22a-36 to 22a-45" of the General Statutes. General Statutes § 22a-42a (d).

I

On July 11, 1988, the defendant Boyer-Napert Partnership, a Connecticut partnership (hereinafter applicant) filed an application with the commission to conduct certain regulated activities in or near wetlands located south of Parkway South in Waterford. These activities were in connection with the development of a ten lot office park on a fifty-three acre site immediately south of Parkway South and immediately west of the old Waterford Airport. An earlier application for a more intensive twelve lot subdivision of the site had previously been submitted and withdrawn.

The applicant proposes to develop approximately thirty-five acres of the fifty-three acre site. The remaining eighteen acres would not be developed but would be retained either as existing inland wetlands, a fifty foot wide wetlands buffer area, a nonencroachment area or ten foot wide noninfringement area. All the proposed development activities were to be conducted outside the wetlands themselves. The wetlands and its denizens would be physically protected from the upland development by the buffer and the nonencroachment and noninfringement areas. It was proposed that the wetlands would be protected from any changes in the quantity or quality of storm water runoff by a series of storm water detention basins. No filling of nor removal of material from the wetlands was requested.

The specific regulated activities to be conducted were:

"(1) Discharge of stormwater from Parkway South Office Center Subdivision into detention basins and into Tyack Swamp Wetlands.

"(2) Discharge of stormwater from Lot No. 1—Quality Inn Residency Suites into subdivision drainage system.

"(3) Establishment of a nondisturbance line as the buffer requirement for Tyack Swamp."

The commission scheduled a public hearing on the application for November 10, 1988, and notice thereof was duly published in the New London Day on October 31, 1988. The commission commenced the public hearing on the application on November 10, 1988. The hearing was not completed but was continued to December 1, 1988, and again to December 15, 1988.

During the course of the public hearings the applicant offered certain expert testimony in support of this project.

Alvin G. Wolfgram, a civil engineer registered in Connecticut, described the planning aspects of the project including drainage proposals designed to protect the integrity of the swamp. Evan Glass, a hydrogeologist with Geotoxi Associates, Inc., a hydrogeologic consulting firm, addressed the potential impacts on the water quality and quantity of aquifers.

Robert S. DeSanto, an environmental scientist with DeLeuw Cather & Company, presented a biotic assessment of the area based upon his inspection. This included an analysis directed toward the preservation of wildlife in the general area.

The applicant also offered a videotape by Noble S. Proctor, Ph.D., concerning the winged life in the area and Fred C. Sibley also addressed the potential impact on the wildlife in the area.

The plaintiff also was heard and offered testimony from David Blockstein of the department of zoology at Connecticut College, who gave an analysis as to the impact of the project on wildlife in the area.

Also heard were a resident, Karen Kroh, and Attorney George Kanabis, representing an abutting landowner.

The commission also received reports, copies of legal decisions, maps, analyses and other documents as exhibits totaling 120.

Thereafter, on February 15, 1989, the commission voted to approve the application subject to seventeen conditions.

## II

In his appeal, the plaintiff claims that the commission: (1) Failed to consider the factors set forth in General Statutes § 22a-41, as well as its regulations §§ 6.1.e.1 to 6.1.e.x, and to state the reasons for granting the permit; (2) failed to find that reasonable and prudent alternatives do not exist and to state the reasons on the record in violation of §§ 22a-19 and 22a-41 (b); (3) failed to demonstrate that the detention basins are adequately designed to minimize and mitigate against water pollution; (4) failed to demonstrate management, preservation, protection and conservation measures to mitigate against the loss of wildlife and wildlife habitat in the Tyack Swamp ecosystem; and (5) denied him the opportunity for cross-examination of witnesses.

All parties have filed briefs.

The specific regulated activities proposed in the application are: (1) Discharge of storm water from a proposed highway known as Financial Boulevard; (2) discharge of storm water from lot no. 1; and (3) work adjacent to wetlands consisting of installation of sanitary and storm sewer lines and establishment of nonencroachment lines.

The permit granted by the commission allowed such activities and provided for discharge of storm water through detention basins from the proposed road, lot no. 1 and a portion of lot no. 11. The permit further provided that the activities be conducted in accordance with: (1) The application; (2) the site plan entitled "Subdivision Plan—Parkway South Office Center" dated July 11, 1988; (3) the exhibits produced at the hearing No. 1-120A; and (4) the comments generated by the commission and town staff.

The permit also provided that the applicant submit revised site plans showing that the detention basins are not to be included within the conservation easement. In addition, the commission imposed seventeen conditions designed to protect the wetlands and ground water and to minimize impacts.

Finally, the permit includes the following language as to its considerations: "The Commission renders this Plenary Ruling based on the following considerations:

"A. No activities involving clearing, deposition or excavation of material or construction will occur within the wetlands.

"B. Permanent buffers through the establishment of non-encroachment lines and Conservation Easement have been required to further protect the wetlands and adjacent uplands.

"C. Additional review of stormwater discharge and wetland protection buffers for lots 2–10 will occur on an individual lot development basis. Additional protection and controls will be required at that time if necessary.

"D. Alternatives have been considered with the proposed development of this property and include the following:

"Stormwater Treatment

"1. Detention by use of retaining berm within wetlands.

"2. No detention.

"3. Detention by on-site basins within the uplands. (approved method)

"Buffers to Wetlands

"1. No permanent buffer.

"2. 50′ minimum permanent buffer adjacent to the wetlands.

"3. 50′–200′ permanent buffer adjacent to the wetlands recommended with additional buffers added with individual lot development if required by the Conservation Commission (approved)."

It should be noted that the plaintiff filed his brief on January 16, 1990. At the court hearing, the court, aware of the pro se posture of the plaintiff, allowed the plaintiff to file a motion to modify the brief, and a supplemental brief. The motion to modify the brief changed the various captions in his brief from the interrogatory to the declarative case. In the supplemental brief the plaintiff raises a due process claim as intervenor; a claim that the commission acted on its own knowledge; that the court lacks the expertise to decide this case, i.e., whether the record supports the commission's decision; that Connecticut should adopt the "market entry" rule of federal case law; and that the plaintiff retains intervenor status until completion of the applicant's work.

A

As to the claim of the plaintiff that the commission failed to consider the statutory factors and failed to state its reasons on the record, it is clear to the court

that the commission has stated the reasons for its approval. Compare *Gagnon* v. *Inland Wetlands & Watercourses Commission,* 213 Conn. 604, 611, 569 A.2d 1094 (1990); *Huck* v. *Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 539 n.11, 525 A.2d 940 (1987); see also *Couch* v. *Zoning Commission,* 141 Conn. 349, 358, 106 A.2d 173 (1954).

Section 22a-43 (a) provides that the appeal is governed by § 4-183 of the General Statutes. See *Cioffoletti* v. *Planning & Zoning Commission,* 209 Conn. 544, 552 A.2d 796 (1989).

General Statutes § 4-183 (j), in effect at the commencement of this appeal; see *Fee* v. *Carothers,* 23 Conn. App. 435, 580 A.2d 1244 (1990); sets forth the standard of proof required in such an appeal. Subdivision (5) of the statute allows the agency's decision to be reversed if it is "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." Under the substantial evidence rule, evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in question can be reasonably inferred. *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 540, 541.

Section 22a-42a (d) requires the agency, when granting a permit, to "consider the factors set forth in section 22a-41, and such agency shall state upon the record the reason for its decision." Section 22a-41 (a) requires the agency to consider "all relevant facts and circumstances," including but not limited to: "(1) The environmental impact of the proposed action; (2) The alternatives to the proposed action; (3) The relationship between short-term uses of the environment and the maintenance and enhancement of long-term productivity; (4) Irreversible and irretrievable commitments of resources which would be involved in the proposed activity; (5) The character and degree of injury to, or

interference with, safety, health or the reasonable use of property which is caused or threatened; and (6) The suitability or unsuitability of such activity to the area for which it is proposed."

The statute does not mandate specific reference in the finding and conclusion to any one of the six factors in a "balancing test." *East Haven Economic Development Commission* v. *Department of Environmental Protection,* 36 Conn. Sup. 1, 8, 409 A.2d 158 (1979).

The proposed activity involves the ultimate dishcharge of storm water from a proposed highway and the uplands lying between the proposed highway and the affected wetlands.

The wetland affected is known as Tyack Swamp, a swamp wetland within a 295 acre drainage basin. The swamp drains in a southeasterly direction over abutting property by means of an unnamed water course to Jordan Brook. The swamp itself consists of poorly drained soils adjacent to the uplands. The inner portion of the wetlands consists of Adrian and Palms Mucks, very poorly drained soils, with the water table near the surface most of the year.

The Connecticut water quality classifications map carries no designation for either the ground water or surface water for the swamp or surrounding areas. The ground water designation for Jordan Brook is GB/GA, not suitable for drinking without treatment. The surface water designation is B/A.

Of prime concern is the method of handling the anticipated runoff, i.e. storm water. An early proposal called for the construction of a stone filter retention structure at the swamp outlet. The present proposal calls for three detention ponds to allow both storm water treatment and control of peak flows. Further, the applicant proposes catch basins in the roadway with hoods

and sumps to allow oil and grease separation and floatable debris removal from the storm water system.

In order to address the environmental matters as required by the statute and by the commission's regulations, the applicant offered a number of expert witnesses, as noted previously, as well as technical assessments prepared by them.

The applicant offered testimony from Wolfgram, a registered civil engineer with the firm of DiCesare-Bentley Engineers. Coupled with his testimony were a series of technical reports:

Exhibit 16—TR-55 Tabular Discharge Method, essentially a basin inflow-outflow hydrograph.

Exhibit 17—Storm Water Runoff Quality and Its Management prepared by DeLeuw Cather & Company, dealing with the handling of contaminants in the runoff.

Exhibit 18—Detention Basin Option Selections and Specifications comparing the several alternatives, also prepared by DeLeuw Cather & Company.

Exhibit 20—An operations and maintenance manual for storm water management.

After Wolfgram discussed the project and the numerous changes therein to accommodate environmental concerns, including relocation of the sanitary sewer line, establishment of a nonencroachment line, and sedimentation and erosion controls for the sewer construction phase, he noted: "As a summary of this project and its impact on the wetlands, no place do we have material deposition within the wetlands and no place do we have material removed from the wetlands. We anticipate that there is no substantial change in the water course system; no substantial diminishing of the natural capacity of Tyack Swamp to function as it has before; and no essential proposed degradation of the water course."

The applicant also presented testimony from Glass. He addressed the potential impact of the project as the quality and quantity of three aquifers that are in the area, and in particular the Jordan Brook Aquifer. He further described proposed measures to mitigate the impact of contaminants in the storm water entering the wetlands. He was of the opinion that, "[i]n terms of water quantity impact to the three types of aquifers, our evaluations indicated that the water quantity available to potentially utilized aquifer areas would not be diminished" and stated the reasons therefor.

He concluded by stating: "The overall conclusion from our assessment is that proper design, installation, and maintenance of the stormwater treatment devices proposed, together with the minimum use of de-icing salt will help assure that the proposed site development will have a negligible effect on the local and regional aquifers."

The commission also heard from DeSanto, who provided an environmental assessment and biotic analysis. He stated that he had been with the project since 1987. His report was entered on the record. He also submitted a selected biotic assessment.

He first described the various types of habitats on the premises affected, and then explained the use of a storm water model to identify the water quality of the potential runoff. He described an onsite inspection made by him from which he concluded that there are no known extant populations of endangered or threatened species of special concern at the site. He further stated: "The consequence of our stormwater management recommendations and the consideration of the habitats and the use of these habitats by native wildlife both in the uplands and in the wetlands led us in

consultation with the design engineer to support the design you see presently before you." His environmental assessment extensively addressed the potential environmental impacts that may result from the development and the means to mitigate such impacts. The biotic assessment exhaustively described the habitats on the site and their possible denizens, e.g. deer, frogs, etc. DeSanto concluded: "In order to protect the integrity of the remaining wildlife, plant and animal, and to compensate for the fragmentation of the habitat, we feel the present proposal has been planned to support corridors of wetlands and the bordering uplands which preserve all the edge—that is the ecotone, so called—which now exists between the uplands and the swamp."

The commission's regulations also require the commission to review all "relevant issues," including not only the factors listed in General Statutes § 22a-41 (a) but also those set forth in General Statutes § 22a-36 embodying the legislative finding. Compare *Red Hill Coalition, Inc.* v. *Conservation Commission,* supra, 721 n.12.

The court finds that the reasons stated on the record are supported by substantial evidence and that the commission has properly considered "the impact of the application on the subject property in accord with the policies outlined in §§ 22a-36 through 22a-45 of the General Statutes and the local regulations." Id., 722–23; *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 539–40.

The commission has stated on the record what evidence it considered, designated its choices, and imposed conditions that have their genesis in the record. It is axiomatic that a granting of a permit warrants a reasonable conclusion that the activity permitted thereby

does not violate the legislative mandate of the commission. See also *Murach* v. *Planning & Zoning Commission,* 196 Conn. 192, 205, 491 A.2d 1058 (1985).

B

The plaintiff next claims the commission violated its legislative mandate by failing to find that a feasible and prudent alternative does not exist and by failing to state such finding and the reasons therefor on the record in violation of General Statutes §§ 22a-19 and 22a-41 (b).

As to § 22a-19, subsection (b) imposes a duty on the commission to consider whether the proposed project does or is reasonably likely to cause unreasonable pollution, impairment or destruction of the aforesaid wetland or of destroying the public trust in the air, water or other natural resources of the state. *Mystic Marinelife Aquarium, Inc.* v. *Gill,* supra, 499.

Whether the proposed conduct is likely unreasonably to pollute or impair or destroy a natural resource is a question of fact. Id., 503; *Manchester Environmental Coalition* v. *Stockton,* 184 Conn. 51, 73, 441 A.2d 68 (1981) (*Speziale, J.,* dissenting). The finding of the commission in granting a plenary decision carries a clear implication that it found the proposed activity not to have the effect of unreasonably polluting, impairing or destroying any natural resource within its jurisdiction. There is substantial evidence in the record to support such a finding. *Gagnon* v. *Inland Wetlands & Watercourses Commission,* supra. Having so found, the commission is not subject to the prohibitory language of § 22a-19 (b), and its approval of the permit so granted is not a violation of the statute.

As to the provisions of § 22a-41 (b), the commission did state in the permit the alternatives it did consider to avoid unreasonable pollution or impairment of the

wetlands. Further, the plaintiff herein submitted a series of alternatives that the commission considered.

The commission was required to find that a feasible and prudent alternative does not exist. It was not incumbent upon the applicant "to submit formal plans or drawings for all possible alternatives." *Red Hill Coalition, Inc.* v. *Conservation Commission,* supra, 726. It should be noted again that the commission cited its rejection of previously offered alternatives in favor of the approved method, which carries the clear inference that the approved method is a prudent and reasonable alternative to the previous proposal.

Since the commission considered all of the plaintiff's alternatives, it may then be inferred that they were rejected for the reason that none was a feasible and prudent alternative. "Reason" is a " 'general principle, law, or warranted presumption that supports a conclusion, explains a fact, or validates a course of conduct.' " *Manor Development Corporation* v. *Conservation Commission,* 180 Conn. 692, 700, 433 A.2d 999 (1980).

The commission was required to consider only alternatives that were prudent and feasible. " 'Prudent' alternatives are those which are economically reasonable in light of the social benefits derived from the activity." *Manchester Environmental Coalition* v. *Stockton,* supra, 63. "Cost may be considered in deciding what is 'prudent.' " Id. Likewise, "feasible" has been defined as "capable of being done or carried out"; Webster, Ninth New Collegiate Dictionary; which is within the construction applied in the Environmental Protection Act. *Manchester Environmental Coalition* v. *Stockton,* supra, 62.

By stating the alternatives for mitigation of impact on the wetlands and that such alternatives were rejected, the commission made it clear that these were

the reasons for approving the final proposal. By declining to accept any of the alternatives offered by the plaintiff, the commission was stating its reasons for finding that there did not in fact exist any feasible and prudent alternative. Such finding is supported by substantial evidence as hereinbefore noted.

## C

In the next two subparagraphs of his appeal, the plaintiff alleges "that the commission failed to demonstrate the detention basins were adequately designed to minimize and mitigate against water pollution and . . . that the commission failed to demonstrate management preservation, protection and conservation measures re loss of wildlife and wildlife habitat in the Tyack Swamp Ecosystems."

The commission clearly considered these factors in granting the permit and there was substantial evidence on both issues to support a finding that the commission acted in accordance with law.

## D

The plaintiff next claims he was denied the opportunity to cross-examine witnesses and was deprived of the right to be apprised of facts upon which the board was asked to act.

In his brief, the plaintiff cites excerpts from cases in Connecticut allegedly pertinent to this issue; i.e., *Wadell* v. *Board of Zoning Appeals*, 136 Conn. 1, 68 A.2d 152 (1949), and *Pizzola* v. *Planning & Zoning Commission*, 167 Conn. 202, 355 A.2d 21 (1974). These citations are followed by the statement: "The cases above closely parallel the instant case. The [inland wetlands agency] denied the plaintiff, an intervening party, due process of law by requiring the asking of questions through the commission, the denial of cross examination of the defendant's experts vis-a-vis the submission of questions onto

the record without questioning, insufficient time to review the expert's responses and offer rebuttal and instruction to some experts and instructions to some experts against responding to questions. Based upon the above the [inland wetlands agency] decision should be reversed."

It is clear that in such a hearing the plaintiff was entitled to due process. *Connecticut Fund for the Environment, Inc.* v. *Stamford,* 192 Conn. 247, 249, 470 A.2d 1214 (1984). Once a question of lack of due process is raised, however, the plaintiff has the burden of proof to show the board acted improperly. *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 536, 538. The plaintiff also has the burden to show that he was prejudiced by the procedural ruling. General Statutes § 4-183 (g); *Murach* v. *Planning & Zoning Commission,* supra; *State* v. *Hawkins,* 162 Conn. 514, 515, 294 A.2d 584, cert. denied, 409 U.S. 984, 93 S. Ct. 332, 34 L. Ed. 2d 249 (1972); *McCrann* v. *Town Plan & Zoning Commission,* 161 Conn. 65, 78, 282 A.2d 900 (1971). It has been held that " 'once it is determined that due process applies, the question remains what process is due.' " *Bartlett* v. *Krause,* 209 Conn. 352, 369, 551 A.2d 710 (1988), quoting *Morrissey* v. *Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). When lack of due process is claimed by a party, the party has the obligation to show that harmful error resulted as a result of the denial of cross-examination. This requires a showing that the cross-examination was germane to the commission's decision. *Wadell* v. *Board of Zoning Appeals,* supra, 10. Otherwise, any such error is harmless. *Dram Associates* v. *Planning & Zoning Commission,* 21 Conn. App. 538, 544, 574 A.2d 1317, cert. denied, 215 Conn. 817, 576 A.2d 544 (1990).

It is first necessary to review the format of the hearing. The hearing was held on three dates: November 10, December 1, and December 15, 1988. At the first session, Attorney Pavetti, for the applicant, presented

his witnesses and Attorney Kanabis spoke in opposition. The session had commenced at 7:30 p.m. At 9:45 p.m., the plaintiff spoke and filed his petition to intervene. Thereafter, the hearing was continued on the representation of the plaintiff that he had a lengthy presentation and numerous questions for cross-examination. Pavetti at that time proposed to the plaintiff that his questions be submitted to the applicant through the commission.

At the session held on December 1, 1988, the chairman called on the plaintiff at 7:30 p.m. The plaintiff then proceeded to argue about procedural matters with the chairman. The chairman then told the plaintiff to proceed with his presentation. The plaintiff responded that he could not do that because his expert witness could not be there until 8 p.m. The chairman then told the plaintiff that any questions for the applicant's witnesses would have to be submitted through the commission, having earlier expressed concern about time constraints. He also pointed out that sessions would have to end at 10 p.m. because of other business of the commission. After further discussion, the plaintiff submitted a list of questions for the applicant's witnesses. He also submitted a list of questions for DeSanto, for Geotoxi and again for DeSanto.

Ultimately, the plaintiff's witness arrived (David Blockenstein) who was examined by the plaintiff. Thereafter, the plaintiff introduced more exhibits. The chairman then asked the plaintiff to proceed with his presentation but the plaintiff declined. It is of some significance that the plaintiff had another witness available whom he chose not to call. The session adjourned at 10 p.m., the remaining time being taken up with procedural discussion. Pavetti pointed out that the hearing had to be completed within forty-five days of commencement with no extensions permissible.

The final session commenced on December 15, 1988, at 7:30 p.m. The responses to the plaintiff's questions were entered into the record. The applicant presented a witness, Sibley, as well as recalling DeSanto, Glass and Wolfgram, who were also questioned by the commission's planner. At 8:50, the plaintiff continued his presentation, representing that he himself was an expert in environmental protection. He also introduced exhibits on various matters, including several issues of the Federal Register. The session ended at 10:16.

From all of the above, it cannot be found that the plaintiff was denied due process in this hearing procedure. It is clear that he was allowed approximately equal time with the applicant. It is further noted that at the second session, he argued procedural matters for one-half hour waiting for his witness to show up. He further argued the final half hour instead of presenting his material to the commission. He also declined to produce a witness he had available.

The court cannot say that the procedure followed by the chairman in having the plaintiff submit questions was violation of due process. "The United States Supreme Court and other courts have often said that 'due process is flexible and calls for such procedural protections as the particular situation demands.'" *Bartlett* v. *Kraus,* supra, quoting *Morrissey* v. *Brewer,* supra. The chairman was acting on the advice of counsel. Further, the commission was obligated to render due process to the applicant by allowing time for a full presentation of its proposal. As an opposing party is entitled to rebuttal, so is the applicant. General Statutes § 22a-42a (e) requires that the "hearing shall be completed within forty-five days of its commencement." There is no provision for extension as in § 8-7d of the General Statutes. Under such time constraints and given the fact that the plaintiff consumed about one half of the time the commission could allot in view

of its own obligations, the plaintiff has failed to show he was prejudiced by such procedure. The facts he wished to bring out were presented to the commission and he had ample opportunity to rebut any such evidence. There is no showing of error or prejudice so as to constitute a denial of due process. See *Red Hill Coalition, Inc.* v. *Conservation Commission,* supra, 724.

In addition, the plaintiff has failed in his obligation to show that the testimony sought by cross-examination was relevant. See *Wadell* v. *Zoning Board of Appeals,* supra, 6. The sole reference to the scope of his inquiry occurs in the "statement of facts" portion of his brief wherein he states that he wanted to cross-examine Wolfgram who had testified "concerning the project's background and the technical characteristics of the permit application." He later referred to the submission of questions that "involved complex scientific and technical issues." Conversely, the applicant in its brief points out that the bulk of the questions—submitted and answered—were not relevant to the direct testimony. The plaintiff has not sustained the burden of showing that the information obtained by answers to his submitted questions was relied on by the commission in its decision. Accordingly, such error, if it indeed is error, is harmless. The same is true of the plaintiff's complaint as to the videotape of Proctor.

The plaintiff has failed to sustain his burden that the commission acted improperly. *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 537; see also *Dram Associates* v. *Planning & Zoning Commission,* supra.

III

In his supplemental brief, the plaintiff claims that the commission erred in treating him no different from members of the public. Presumably, the claim is raised because the commission did not find specifically that he had or had not established the claim raised in his

petition to intervene. It is clear to the court that the commission concluded that the plaintiff had failed to establish the facts necessary for relief under § 22a-19 (b) of the General Statutes; the court in searching the record; *Gagnon* v. *Inland Wetlands & Watercourses Commission,* supra; finds the commission acted properly.

The plaintiff next claims that the commission relied on its own knowledge in reaching a decision and not on substantial evidence. The court has already found that the commission acted on substantial evidence.

The third claim is that the Superior Court is incompetent to review the record and determine whether the record supports the agency's decision. This, of course, is a matter that the plaintiff must take up with the legislature; see *Pellegrino* v. *O'Neill,* 193 Conn. 670, 685, 480 A.2d 476, cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984); if not to a higher authority. See article XVIII of the amendments to the Connecticut constitution.

The fourth claim refers to federal case law under a so-called "market entry" rule which the plaintiff concedes has no reference to Connecticut law.

"In challenging the administrative action involved in this case, the plaintiff . . . had the burden of proof in doing so. . . . [He] has not sustained that burden." (Citation omitted.) *Mystic Marinelife Aquarium, Inc.* v. *Gill,* supra, 503.

The appeal is dismissed.