[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Bonita McBrearity has appealed from a decision of the Commission on Human Rights and Opportunities (CHRO), which dismissed a complaint of discrimination filed by her. In an affidavit of Illegal Discriminatory Practice the plaintiff filed with the CHRO on July 12, 1993, the plaintiff complained that she was discharged by her employer, the Kimberly-Clark Corporation because of her physical disability, chronic back problem, in violation of Conn. Gen. Stat. §§ 46a-58 (a) and 46a)60(a)(1), as well as several related federal statutes. See Record 39-41. More specifically the plaintiff alleged that she fell and injured her back while at work in February 1992 which resulted in a permanent disability. She alleged that she was terminated because of her disability in April 1993. Id. Defendant denied these assertions. See Record 71-73.
The plaintiff's complaint was dismissed in accordance with P.A. 94-238, now codified as Conn. Gen. Stat. § 46a-83 (b), on the ground that there was no reasonable possibility that investigating the complaint would result in a finding of reasonable cause. See Record 25-38. The plaintiff requested reconsideration of the dismissal; see Record 17-20; which was rejected by the CHRO. See Record 3-9. Plaintiff now challenges this dismissal in this appeal.
 I
Public Act 94-238, § 1 empowers the CHRO to dismiss any complaint if, after reviewing the "complaint, the respondent's answer and the responses to the commission's requests for information, if any, and the complainant's comments, if any, to the respondent's answer and information responses . . . there is no CT Page 10999 reasonable possibility that investigating the complaint will result in a finding of reasonable cause. . . ." That was precisely the tack the CHRO took in this case, and with good reason.
The CHRO's investigative file contains extensive evidence bearing on this matter. The record fully reflects the following facts. The plaintiff was employed as a utility cleaner in the tissue manufacturing department of defendant's New Milford plant. See Record 74. Her performance and attendance were generally acceptable, even "solid"; see Record 90; but with a few blemishes over a long career. See Record 7-6, 80, 83-89.
On February 10, 1992, the plaintiff injured her back while working. See Record 40. She slipped while crossing a catwalk, landing on her right side. See Record 139. She made a worker's compensation claim, noting the following injuries: back injury, pain radiating down both legs, right hip injury, right arm injury. See Record 142.
The plaintiff complained to her treating physician, Dr. Jesse Manlapaz, of low back pain on February 26, 1992; see Record 111; March 30, 1992; see Record 119; April 14, 1992; see Record 121; May 4, 1992; see Record 122; May 26, 1992; see Record 124; June 4, 1992; see Record 125; June 24, 1992; see Record 128; August 4, 1992; see Record 131; and September 14, 1992; see Record 133. She was doing very well on February 8, 1993, though. See Record 135. She complained of "constant midline lower back pain" to Dr. Ripps, when he saw her for an independent medical evaluation on August 12, 1992. See Record 97-98. Dr. Ripps believed that plaintiff "had reached maximal (sic) medical improvement" when he examined her then. See Record 98, 166. Her own physician, Dr. Manlapaz, put the date at September 21. The two sides compromised on September 7, 1992. See Record 174-75.
The plaintiff was initially seen by Dr. Orlandi, who cleared her to return to light duty work on March 19, 1992, some five weeks after her injury. See Record 92. On June 10, 1992, the plaintiff left work stating that her back hurt. See Record 77. According to her treating physician, Dr. Jesse Manlapaz, she was "totally disabled from her job: see Record 127; as she was suffering from a bulging disc. See Record 126. This diagnosis was confirmed by an MRI report of Dr. Stuart L. Roberts at Danbury Hospital. See Record 123. She was "still totally disabled form her job" on September 2, 1992 in Dr. Manlapaz's opinion. See Record 163. This was only a matter of weeks before plaintiff reached her maximum improvement, CT Page 11000 and there was no further treatment for her other than to continue her exercise regimen. See Record 42. Plaintiff did not work in any capacity from June 10, 1992 until she was released from the defendant's employ on April 5, 1993. See Record 79.
The record confirms that the plaintiff's job as a utility cleaner was a rigorous one. The job description requires a vast variety of cleaning and washing responsibilities. See Record 181-82. The plaintiff's former manager, in writing her a letter of recommendation, noted that her job "requires a high level of physical labor periodically and is a tough working environment (hot summers, dusty)." See Record 90. Dr. Ripps had a chance to view the worksite and observe firsthand the vigorous nature of the job. He wrote that the job could "be demanding on the back"; see Record 165; due to lifting and bending requirements. "One particularly onerous responsibility of the light duty employee is to clean underneath the conveyors which requires stooping down or crawling on the hands and knees." See Record 165-66. The minimum skill level, or MLS, for the position "is considerably heavier. It not only requires a 12 hour working shift, but it requires carrying bags of chemicals weighing up to 50 pounds for short distances. There are periodically very heavy responsibilities . . . this is truly backbreaking work, and it is understandable why anyone who would have to do that on a regular basis would have a sore back." Id.
According to Dr. Manlapaz,
 What Dr. Ripps is saying confirms my impression when I went to Kimberly-Clark and also on the tour to see how the crew members work on 12 hour shifts could function. Most of the work at Kimberly-Clark is a back-breaking job, because they are part of an assembly line machinery. The machine is incorporated with the human being and the human being has to function as part of the machine. All of (sic) these things requires repetitive movement, bending, shifting, working with their hands, standing on their feet for hours on end. The only time they could obtain a rest is if they have to go to the bathroom for personal needs, or fall down in a heap of exhaustion. It reminds me of the film with Charlie Chaplin beating the time clock and Lucille Ball's comedy of manufacturing chocolate candies. It is laughable sometimes, looks like a comedy and these poor people are on the assembly line working with back-breaking jobs. CT Page 11001
See Record 42.
Dr. Manlapaz goes on to say:
 Lifting 50 lb bags of a chemical is a back-breaking job — I do not care what anyone says — it is a back-breaking job.
 I have seen these people work there and they are highly paid, but the job is rough. Stooping down underneath the conveyor belts of that machinery and cleaning the machines requires a lot of physical work, particularly on a 12 hour shift.
See Record 43.
The plaintiff was unable to perform this work because of her back injury. Dr. Manlapaz released plaintiff to return to work with lifting and bending restrictions on October 21, 1992. See Record 106. According to Dr. Manlapaz, plaintiff could not do repetitive bending. She could only "bend once or twice a day." See Record 107. As Dr. Manlapaz observed, "[w]hen you work in a factory, either you can do the job or you can't — whether it is light duty or not." See Record 43. And the plaintiff could not. She did not even report to work at any time after June 10, 1992, nearly 10 months before she was in fact terminated. Being able to bend only once or twice a day would not be sufficient to allow plaintiff to perform her job. "The cleaner needs to be able to operate a Condor, (equipment that lifts and moves a person), to clean the higher areas in the department, and be able to climb, crawl, and kneel around the machine, the mezzanine, the basement, and the stairs to ensure that the department is clean from dust. These tasks involve a significant amount of bending and occasional lifting of heavy chemicals and materials that weigh up to 50 pounds." See Record 76-77, 235. She knew this; that is why she stayed away from work.
Despite the obvious obstacles posed by her physical condition, the plaintiff contends that the employer should have reasonably accommodated her and found another position for her, a job other than as a utility cleaner. It is an open question as to whether Connecticut law imposes a burden of reasonable accommodation on an employer. Adriani v. CHRO, 220 Conn. 307, 320 n. 12 (1991). Assuming it does, as the CHRO believes, it still does not avail CT Page 11002 plaintiff given her inability or unwillingness to return to work. The plaintiff herself has never suggested any alternate position she could perform with employer. Indeed, her conduct shows that she either could not return to work or was no longer interested in working for Kimberly-Clark. According to Dr. Manlapaz in a notation dated February 8, 1993, just a few months before she was separated, the plaintiff was "studying to become a police officer right now at school." See Record 135. In November 1992, Dr. Manlapaz also noted that she was interested in becoming a radiology technician. See Record 134. Both these jobs are far removed from the mill where plaintiff had previously worked as a utility cleaner since 1973, perhaps for most or all her working life, she was 37 in 1992. See Record 111, 118. The Company did make efforts to find another position for her, but a "search across the mill produced no other job opportunities for which plaintiff was otherwise qualified." See Record 235. Her employer had checked with other departments, but as of March 3, 1993, no positions were available for which plaintiff was qualified which would be within her medical restrictions. See Record 183. The essentially no-bending restrictions imposed by Dr. Manlapaz because of plaintiff's back injury made it impossible to locate any factory work which plaintiff could perform. In this appeal plaintiff tries to gain advantage by arguing that insufficient efforts were made to accommodate her, pointing particularly to defendant's failure to meet with her. "This meeting never took place. Instead the employer, by letter dated April 5, 1993, terminated [Plaintiff's] employment with it." Id. at 5. This is not quite the case, as a review of the record demonstrates. The employer had set up a meeting with the plaintiff for March 10, 1993. This meeting was "scheduled solely for the purpose of determining whether or not there was work available for [plaintiff] within her medical restrictions." See Record 226. It was not held because plaintiff showed up with her attorney. See Record 224. As defendant pointed out, "Kimberly-Clark does not as a general rule have its attorney present at such meetings and did not on this occasion have an attorney present." See Record 11.
The plaintiff's attorney eventually agreed that the plaintiff could meet without him, but wanted to have the results of the meeting put in writing. See Record 227. This letter is dated March 31, 1993. Id. The letter was not postmarked until April 5, 1993, the very same date the company notified the plaintiff that she was terminated. Se [See] Record 229. it did not arrive until April 6, 1993; however; see Record 12; a day after plaintiff lost her job. CT Page 11003
The plaintiff did not take the initiative and schedule a meeting with employer and so it went ahead and made a decision on the basis of the then-existing information. See Record 229. The employer could hardly be expected to continue the plaintiff indefinitely on its payroll. At that point, the plaintiff had not been working for nearly 10 months. It was because of the legitimate needs of her employer that the decision was made to go with the information on hand. As the CHRO found, "documentation supports that [plaintiff] was restricted from her former position and she declined to discuss accommodations with [Defendant]." See Record 7.
 II
The plaintiff also argues that the CHRO's decision on her reconsideration request "was untimely and should be considered void by the court." See plaintiff's brief at 6.
The record indicates that, after the CHRO sent notice of its closure of plaintiff's case, she requested reconsideration of the dismissal. See Record 17-20. The request was received on September 20, 1994. See Record 17. The CHRO rejected it on January 23, 1995. See Record 2. This is some 135 days following the agency's receipt of the request.
Pointing to Conn. Gen. Stat. § 46a-83 (e), the plaintiff argues that the CHRO's decision on the request was untimely, in that a decision to reconsider or reject a dismissal should be made "within ninety days of the issuance of such finding or dismissal."
The requirement in Conn. Gen. Stat. § 46a-83 (e) that a decision on a request for reconsideration be made within 90 days of its issuance is directory, not mandatory. Courts have read other time provisions involving the CHRO to be directory only. BridgeportHospital v. CHRO,, No. CV 92-0299985, J.D. of Fairfield at Bridgeport, (February 18, 1994) (Maloney, J.), rev'd on othergrounds, 232 Conn. 91 (1995) (Conn. Gen. Stat. § 46a-82a); CHRO v.Truelove and Maclean, No. CV 93 0115306, J.D. of Waterbury (July 20, 1994) (Sullivan, J.); Apricots v. CHRO, No. CV 93 0704762, J.D. of Hartford-New Britain at Hartford (December 19, 1994) (Maloney, J.), appeal filed on other grounds, January 14, 1995 (Conn. Gen. Stat. (Rev. 1993) § 46a-83 (b); Conn. Gen. Stat. (Rev. 1993) § 46a-84[b]). There is nothing which differentiates the 90 day time period found in Conn. Gen. Stat. § 46a-83 (e) from the 9 month period for investigating a complaint which the court found to be directory in Apricots, supra. Indeed, both time frames must be CT Page 11004 regarded as directory under established principles of statutory construction.
As a general rule, statutory provisions designed to secure order, system and dispatch — including those containing the word "shall" — are directory. Fidelity Trust Co. v. BVD Associates,196 Conn. 270, 278 (1985); Weiss v. Newtown, 4 Conn. App. 200, 202
(1985). "[P]rovisions regulating the duties of public officers and specifying the time for their performance in that regard are generally directory." 2A Southerland, Statutory Construction (4th Ed. Sands) § 57.19, quoted in Tramontano v. Dilieto, 192 Conn. 426,432 (1984). Many decisions similarly hold. Statewide GrievanceCommittee v. Rozbicki, 219 Conn. 473 (1991), cert. denied,
___ U.S. ___, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992) (Practice Book provision stating that a hearing on the merits of a presentment claim "shall be held within sixty days of the date the complaint was filed with the court" held directory; Caron v. Inland Wetlands Watercourses Commission, 222 Conn. 269 (1992) (statute which read that action "shall be taken" by a local wetlands agency on applications within 35 days after completion of public hearing or in the absence of a hearing within 65 days from the date of receipt of the application held to be directory); Donohue v. ZBA, 155 Conn. 550
(1967) (statute stating that a zoning board of appeals "shall decide [an] appeal within sixty days after hearing" is directory).
Moreover, the plaintiff in this appeal is required to prove that the action of the CHRO prejudiced her rights. This requirement is announced in Conn. Gen. Stat. § 4-183 (j): "The court shall affirm the decision of the agency unless . . . substantial rights of the person appealing have been prejudiced. . . ." Thus, in this administrative appeal, the plaintiff not only carries the ordinary burden to prove error on the part of the CHRO; Samperi v. InlandWetlands Agency, 226 Conn. 579, 587 (1993); Lieb v. Board ofExaminers, 177 Conn. 78, 93 (1979); she must also show that the error prejudiced her. "Not all procedural irregularities require a reviewing court to set aside an administrative decision; material prejudice to the complaining party . . . must be shown." Jutkowitzv. Department of Health Services, 220 Conn. 86, 97 (1991). "Substantial prejudice must be affirmatively shown." Lawrence v.Kozlowski, 171 Conn. 705, 710, cert. denied, 431 U.S. 969 (1977);Madow v. Muzio, 176 Conn. 374, 382 (1978); Fromer v. Boyer-NapertPartnership, 42 Conn. Sup. 57, 72, aff'd, 26 Conn. App. 185 (1991). "Even a demonstration of procedural irregularities would not require us to set aside the [CHRO's] decision in the absence of a showing of material prejudice." Anziano v. Board of PoliceCT Page 11005Commissioners, 229 Conn. 703, 713 (1994). This plaintiff has not shown how the delay prejudiced her. This is fatal to her claim.
 III
"In challenging the administrative action . . . the plaintiff . . . had the burden of proof. . . . She has not sustained that burden." Mystic Marinelife Aquarium, Inc. v. Gill, 175 Conn. 483,503 (1978). Consequently, this appeal is dismissed.
PICKETT, J.