[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO DISMISS
This is an action commenced by the Saturn Construction Company seeking injunctive and declaratory relief. The action seeks this relief to protect it from what it claims is the irreparable harm that Saturn claims it is incurring as the result of the State's unconstitutional and wrongful. termination of a multi-million dollar contract to construct a state office complex. Pending before the court is the application for temporary injunctive relief. The State has filed a motion to dismiss based on the grounds of (1) the prior pending action doctrine and (2) sovereign immunity.
Both of these claims go to the jurisdiction of the court and must be addressed by the court and must be addressed by before anything else may occur in this case, Baldwin Piano Organ Co. v. Blake 186 Conn. 295, 297 (1982), Denton v. Danbury48 Conn. 368, 372 (1880).
The motion to dismiss incorporates two modes of raising an attack on the jurisdiction of the court at common law: the motion to erase and the plea in abatement. In Brewster v.Brewster 152 Conn. 228, 233 (1964) the court said regarding the motion to dismiss filed in that case that since it:
 . . "does not seek to introduce facts outside of the record it is equivalent to our former motion to erase and admits all well pleaded facts, the complaint being construed most favorably to the plaintiff." CT Page 10302
See also Duguay v. Hopkins 191 Conn. 222, 227 (1983), Barde v.Board of Trustees 207 Conn. 59, 62 (1988).
However, a motion to dismiss doesn't require the court to assume the truth of the complaint's allegations when the defendant introduces facts outside the record by way of affidavit, cf Otis T. Bradley's Appeal from Probate 19 Conn. App. 456,461-482 (1989). In such a case "the court may look to (the affidavit's) content for determination of the jurisdictional issue and need not conclusively presume the validity of the allegations of the complaint, Barde v. Board ofTrustees 207 Conn. at page 62. But this broad statement requires further analysis.
What are the facts before the court however and how is the court to review those facts in deciding this motion?
In their October 24, 1994 brief the defendants refer to the allegations of the complaint in setting forth what they consider the factual context in which this case must be decided; the brief also refers to Mr. Cappelli's affidavit. The defendants' reply brief of December 9, 1994 is replete with references to not only the allegations of the complaint but also to Mr. Cappelli's affidavit and/or exhibits and it is fair to say these materials don't substantially dispute many of the allegations of the complaint or of Mr. Cappelli's affidavit.
The defendants had the opportunity to submit further affidavits. They as well as the plaintiff could have requested an evidentiary hearing. Neither of these things were done. The court's position then as to what is before the court is that in the jurisdictional claim it will consider the verified complaint, the Cappelli affidavit and the affidavits with attached material submitted by the defendants. However, in reaching conclusions on jurisdiction the court will adopt what is apparently the federal procedure involving litigation under long arm statutes which also raise issues of jurisdiction if only of personal jurisdiction. In Ten MileIndustrial Park v. Western Plains 810 F.2d 1518, 1542 (ES 10. 1987) the court said:
 "In ascertaining the facts necessary to establish jurisdiction the district court CT Page 10303 must accept as true the allegations set forth in the complaint to the extent they are uncontroverted by defendant's affidavits."
The court will accept as true well pled non-conclusory facts in the plaintiff's verified complaint and the Cappelli affidavit to the extent they are uncontroverted by defendant's affidavits.
In April of 1961 the plaintiff Saturn entered into a contract with the State Department of Public Works (DPU) to perform certain work regarding the Department of Transportation Building (DOT). The contract was for twenty million dollars. In accordance with state statute Saturn executed a labor and material and a performance bond with the Insurance Company of America (INA) to provide insurance coverage in case Saturn breached its contract. Saturn was to start work on the awarding of the contract but wasn't directed to start work by DPW until three weeks had passed. During construction jurisdictional and building code disputes developed between DOT, the Division of Fire, Emergency, and Building Services (SBI), and the architect, delaying the project and disrupting Saturn's work. Because of architect error Saturn was forced to initiate over 800 requests for information further delaying the project. Also Saturn alleges that both prior and subsequent to the original contract completion date Saturn received 82 Change Orders relating to SBI code issues which Saturn indicated would extend the project completion date by several months. These change orders had a value of over $900,000 dollars. In addition DPW issued over 400 change orders. Saturn met with DPW in May of 1992 and informed DPW that it could not give DPW a completion date for the project because of the change orders. DPW indicated the changes would stop but they didn't. In the ten months following the meeting 226 change order were submitted by DPW.
In November 1992 Saturn requested a ten month extension to June 1993 and was told the matter was under consideration by a DPW construction manager. In December 1992 DPW ordered that the project be completed by March 1993 and Saturn told DPW that it would have to stop issuing change orders — 112, however, came in after that date. CT Page 10304
In January 1993 Saturn had two meetings. At the first meeting attended by the DOT and DPW commissioners DOT ordered Saturn to complete the project by April 1993. Saturn indicated the project could be completed only if certain conditions were met among which was the cessation of DPW change orders. At the second meeting Saturn indicated the need for more funds to cover the cost of pending change orders and acceleration costs and was told this would not be a problem on the bases of the estimates Saturn submitted. After these meetings and until April 1993 77 additional change order requests were submitted.
Saturn began a accelerating the work after the January 1993 meetings but in February was told by DPW to submit a schedule for completion and cease premium time work due to budgetary restrictions. Saturn indicated that due to contracts it made with subcontractors it would have to continue its acceleration efforts and submitted a completion schedule. This schedule was dependent upon DPW's timely resolution of pending change orders, SBI stop work notices and other design deficiencies. Saturn and DPW continued to meet in March to review open work items. DPW during this time advised Saturn it should consider arbitration because of DPW's inability to resolve open issues with Saturn. On March 18, 1993 Saturn commenced an arbitration proceeding pursuant to the contract and § 4-61(b) of the general statutes. The Rules of the American Arbitration Association (AAA) applied to this proceeding. Between January 28 and April 13, 1993 Saturn incurred almost a half million dollars in acceleration costs and completed over two and a half million dollars of contract and change order work. On April 8, 1993 DPW representatives met with Saturn and examined the project and DPW complimented Saturn on the quality of the work and its state of completion.
On April 14, 1993 Saturn alleges that without any prior notice or opportunity to cure DPW advised Saturn that it had terminated its contract. DPW's letter referenced Article 33, Subdivision 1(c-f) of this so-called Phase II B contract but did not provide specific facts to support the termination. Saturn was not provided an opportunity to respond or be heard as to the termination of the contract.
On May 4, 1993 there was a meeting with INA called by the defendants which Saturn was not permitted to attend. After the meeting Saturn spoke with INA and it was advised that CT Page 10305 Saturn would be unable to secure bonding for future construction projects. Saturn alleges that as a result of the April 1993 termination it has been unable to acquire insurance bonds necessary for public construction projects. Pre-bid qualification questionnaires require Saturn to disclose the termination which operates as a disqualifying factor for the issuance of insurance. Without being able to procure insurance bonds Saturn hasn't been able to bid on public construction projects which has been a substantial part of its business and its long standing relationship with its surety, INA, has been damaged. Saturn says that therefore it has suffered such irreparable harm that it may be put out of business.
The Office of Planning and Management (OPM) on June 24, 1993 entered into a Takeover Agreement with INA which included additional change orders and provided a 90 day period to finish the work. Saturn entered into a Completion Agreement on the same date and proceeded to complete the project. Saturn on that date also met with OPM to discuss having access to its project office, rescission of the termination, and processing the acceleration change order so Saturn could be paid the half million dollars it alleges DPW promised it. On July 29 OPM said it wouldn't rescind the termination and would not pay the acceleration costs.
On November 12, 1993 Saturn filed an amended arbitration claim pursuant to the Rules of the AAA that supplemented the March 1993 claim and additional claims arising from the termination.
On January 18, 1994 the AAA advised both parties of the scheduling of an administrative conference for February 14, 1994 before an AAA representative. In a February 14, 1994 letter the State for the first time claimed that the March demand for arbitration and the November amendment failed to comply with the statutory requirements of § 4-6(b) and were thus nullities. On this basis the State refused to recognize the jurisdiction of the AAA and participate in arbitration.
Saturn which claims it did not agree with the State's position was willing to supplement its claims and said it did so to avoid additional delay. Saturn, however, did not file a second amended demand for arbitration until May 1994. CT Page 10306
The State refused to consent to an immediate hearing in the cause of the April 1993 termination relying on § 4-6(b) of the general statutes. That section provides that without consent no hearing may be held less than six months after the demand for arbitration. The State maintained that the six month period only began to run after the filing of the second amended complaint.
The State submitted the affidavit of Karen Jalkut regional vice president of The AAA. Attached to that affidavit is a letter from an attorney apparently representing the interests of the state. This letter appears to be the above referenced letter of February 14, 1994 in which the defendants in some detail explain why under the applicable statutes the April and November 1993 were considered nullities by the state. The letter also makes clear that the State reserves its right to contest that any claims submitted by Saturn are proper subjects of arbitration.
A September 1994 letter from special counsel for Saturn to the AAA director of case administration is also attached to the Jalkut affidavit. This letter describes at length what Saturn claimed was the politically charged nature of the public works project involved, points to the fact that Saturn is an out of state contractor and presses the AAA to consider appointing non-Connecticut residents to any arbitration panel. A September 1994 reply to this letter by counsel for the state is also attached to the Jalkut affidavit. It is a lengthy reply to Saturn's request for the appointment of Non-Connecticut arbitrators and asks the AAA to reject the Saturn request. An October response to this letter is included and an AAA letter rejecting Saturn's request to consider use of a panel that would include out of state arbitrators. A Saturn letter to AAA expressed the company's displeasure with the association's decision.
During the course of the discussion of the legal issues raised the court will discuss various references made by counsel for the state as to the weight that should be attached to the allegations made in the verified complaint and the Cappelli affidavit. Some if not all of these comments seem to contest the Saturn claim that any injury inflicted on it by the action's of the State were irreparable. Thus the State points out the delay between the April demand for arbitration and the amended demand in November 1993 which sought to assert CT Page 10307 claims arising out of the April termination of the contract. The question raised by Saturn over the composition of the panel noted in the previously mentioned correspondence caused some delay. Also the State points out that a fair reading of the complaint and Cappelli affidavit indicates that Saturn in addition to public construction work does private construction work and there is no allegation that this was affected by any action taken by the state. Also the State argues that no real factual basis for the claim of impending financial disaster is laid out and any such claim is belied by the delays in resolving this matter caused by Saturn and just referred to by the court. This is the extent that the State has chosen to question the factual allegations of the plaintiff. It has not requested an evidentiary hearing or submitted further affidavits directly contesting the plaintiff's allegations.
1.
Prior Pending Action
There is a pending arbitration matter between the parties and the State argues in quite flowery terms that "the pendency of the arbitration . . . . requires application of the prior pending action doctrine, and the dismissal of this vexatious and obnoxious action," pp. 4-5 of 10/24/95 brief.
The State at the same point in its brief concedes that the arbitration action by Saturn seeks monetary relief. The gravamen of the relief sought in this court action is an attempt to seek injunctive relief which would compel the State to rescind the termination letter pending arbitration so as to prevent irreparable harm to Saturn.
As long as an arbitration matter whose award can be enforced in our courts is pending in our state there is no reason for the doctrine not to apply as long as its conditions are otherwise met.
The problem for the State here is that the conditions for the application of the doctrine are not met. The ancient statement of the doctrine still applies:
 "The pendency of a prior suit of the same character, between the same parties, brought to obtain the same end or object CT Page 10308 is at the common law good cause of abatement. It is so because there can not be any reason or necessity for bringing the second; and therefore it must be oppressive and vexatious . . . . This is a rule of justice and equity, generally applicable, and always, where the two suits are virtually alike and in the same jurisdiction," Hatch v. Spofford 22 Conn. 485, 49 (1853) See Henry F. Raab Inc. v. J.W. Fisher Co. 183 Conn. 108, 112
(1981).
There isn't sufficient identity between the claims being made or the relief being sought in the arbitration case and the one now before the court for the doctrine to apply, cfConti v. Murphy 23 Conn. App. 174, 178 (1990).
Besides as said in Farley-Harvey Co. v. Madden 105 Conn. 679,682 (1927): "The rule forbidding the second action is not, however, one `of unbending rigor, nor of universal application, nor a principle of absolute law'." Query whether even if the requirements of the doctrine were otherwise met here a court should apply the doctrine and either avoid dealing with the constitutional claims being made or leave their resolution to arbitrators? In other words if the plaintiff's constitutional claim is viable and thus isn't barred by sovereign immunity the doctrine shouldn't apply to defeat Saturn's request for immediate relief. Certainly then the doctrine shouldn't apply so as to preclude even a review of that constitutional claim.
2.
Sovereign Immunity
The defendant State has filed a motion to dismiss based on sovereign immunity. Justice Peters comments in her dissent in Pelligrino v. O'Neill 193 Conn. 670, 692 (1984) should be kept in mind:
 . . . "at least when there is a prayer for general equitable relief, it is the law in our courts, as it is in the federal courts, that `a court may dismiss CT Page 10309 a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations . . ." The fact that the plaintiffs' claims raise novel and complex constitutional questions is not a reason for strict construction of their complaint . . . `The more extreme or even far-fetched is the asserted theory of liability, the more important it is that the conceptual legal theories be explored and assayed in light of the actual facts, not a pleader's suppositions . . .
As far as the doctrine of sovereign immunity is concerned it serves an important role in preventing unjustifiable interference with the state's performance of its functions and a suit should be dismissed if the doctrine applies. On the other hand the doctrine has to be modified under our concept of constitutional government "where the source of governmental power and authority is not vested by divine right in a ruler but rests in the people themselves who have adopted constitutions creating governments with defined and limited powers and courts to interpret these basic laws", Horton v.Meskill 172 Conn. 615, 623 (1977).
(A)
Section 4-61 of the general statutes permits a person or a company to make a claim for monetary loss against local or state government when a contract dispute occurs or a dispute over the awarding of a contract.
An action can be brought to Superior Court under § 4-61(a) or "as an alternative to the procedure provided in subsection (a)" the claimant can submit a demand for arbitration.
Some of the debate in this case has focused on the power of the court to provide injunctive relief given the fact that Saturn has elected to submit its claim to arbitration. Section 4-6(b)(e) is cited with reference to its last sentence: "Awards shall be final and bonding and subject to confirmation modification or vacation pursuant to chapter 909." Chapter 909 contains Sec. 52-422 which says "at any CT Page 10310 time before an award is rendered pursuant to an arbitration under this chapter, the Superior Court . . . may make forthwith such order or decree, issue such process and direct such proceedings as may be necessary to protect the rights of the parties pending the rendering of the award and to secure the satisfaction thereof when rendered and conformed."
However, the specific language in § 4-61(e) seems to refer only to Sections 52-417 through 52-420 of Chapter 909 which deal explicitly with modification, vacation, and confirmation of awards.
But to me the resolution of this issue doesn't turn on the intricacies of whether or to what extent a court has power to provide equitable relief once arbitration procedure commences. In other words if Saturn had brought its claim to court under § 4-61(a) the question now before the court would still present itself if Saturn had tried to get the relief it now demands prior to the actual court hearing on the merits of any § 4-61 claim.
The State has an obvious need to enter into contractual relations with citizens and businesses to build, modify and improve state buildings and facilities. In order to make such contractual activity feasible the state has to provide a mechanism for people to advance claims against the state when disputes arise under these contracts otherwise it would be difficult to imagine anyone entering into a contract with the state at less than astronomical cost.
Both the state and the people and companies it enters into contractual relations with rely on the efficiency and integrity of the claim procedure set up in Section 4-61 of our statutes.
The question is then do the courts have the power to grant equitable relief when the claim is made that such an exercise of power is necessary to accomplish this last stated goal? Of course they do and this has been a traditional function of the courts when exercising their power to grant relief in equity. But it is a distinct type of equitable or injunctive relief that doesn't necessarily fit the analytical framework of cases like Griffin Hospital v. Commission onHospitals and Health Care 196 Conn. 451 (1985). In other words one of the necessary requirements for securing CT Page 10311 injunctive relief — a showing of probable success on the merits — isn't so much at issue. The reason for granting equitable relief in this type of situation would be to protect the very integrity of the legal process set up to determine claims. Unless this were to be done in many cases there would indeed not be an adequate remedy at law.
Courts have granted equitable relief for such purposes and have done so in cases where a matter has been submitted to arbitration. The right of a court to so act rests on its general equitable powers apart from any explicit grant of such authority to so act provided for in statutes like § 52-422. Thus courts have the power to enjoin particular arbitrators from taking part in arbitration where bias or corrupt motive is shown, Grier Brothers v. Mott 144 Conn. 303, 307, (1957) cfMetropolitan Property Casualty v. J.C. Penney Casualty780 F. Sup. 885, 893 (1991) or where there is a claim that arbitrators were not selected according to an agreed upon selection process Hartford Steamboiler v. IRI12 Conn. L. Rptr. 464, 468 (1994). In Yellin v. Premier Development 9 CSCR 502,503 (1994) the court held that where an agreement said any "dispute shall be handled by binding arbitration" the court still had jurisdiction to consider a prejudgment remedy. InGoodson v. State 228 Conn. 106 (1993) the trial court used § 52-422
to reinstate a discharged state employee pending resolution of his grievance. The Supreme Court did not hold the trial court acted correctly but said the matter should be resolved by way of permitting a direct appeal of the trial court's action so that the applicable state statutes could be reviewed. See also a case acted by Saturn, Morganti v. PhoenixFounders Inc. No. 29-53-00, Sup. Ct Danbury 1988 where the court granted the contractor a temporary injunction against the owner requiring the owner to make payments pursuant to the contract although arbitration had been started. The court noted that unless injunctive relief were to be granted the bonding capacity of the plaintiff would be reduced and the contractor would have difficulty in taking on other jobs. There is no adequate remedy at law because immediate relief is not likely to be obtained through the arbitration process.
(i)
In this case the plaintiff has alleged that the termination of its contract substantially interfered with its ability to get new business in the public sector and has CT Page 10312 driven it to the edge of bankruptcy. Saturn has also alleged in its pleadings and by way of the Cappelli affidavit that the State has improperly delayed the arbitration process in a variety of ways. The arbitrators here can only give monetary relief and any award would be subject to appeal. By implication at least the plaintiff raises the possibility that the termination decision if not amenable to speedy judicial review will result in the company's demise. Not only does Saturn request court orders that the State proceed expediously with arbitration, it could be argued, reading its allegations in a light most favorable to its claim, that the nature of the arbitration process itself is inadequate whether or not the state has been at fault in delaying it. This would be so because the act of terminating the contract in itself threatens Saturns ability to operate and even its existence. That is, Saturn has no adequate remedy at law because the right to make a claim for monetary damages under the statutory scheme will be of little worth if inability to get injunctive relief may mean it, the claimant, is forced out of business by delay (1) either unfairly caused by the State or (2) inherent in the arbitration process.
It is true that in its affidavit the State presents a well-crafted letter from its attorney which supports an argument that Saturn was responsible for the delay in making and pursuing its arbitration claim. But the letter is conclusory in nature and it is obvious that there are factual disputes between the parties over this issue. This a factual dispute that goes to the merits of the claim itself and should be resolved at a hearing on the injunction not by means of a motion to dismiss.
(ii)
If the allegations of the complaint and the Cappelli affidavit are read in a light most favorable to Saturn there is a claim of simple contract violation which does not need to have a violation of due process label attached to it in order for Saturn to secure the relief it requests.
Saturn argues that the provisions of Article 33c through of this contract gave it certain rights before the contract could be terminated. It had to be notified of the factual basis for the alleged violations. Saturn also claims that it then had a right to have an opportunity to question or contest CT Page 10313 the proferred reasons for the termination at an informal hearing. Saturn finally claims that under the contract it had a right to "cure" the alleged defects in its performance.
In its thorough December 9, 1994 brief the State raises questions of contract interpretation regarding whether Article 33 of the contract gives Saturn the rights it now claims.
At points in both its briefs Saturn appears to want to give this argument a due process basis. That is § 4-61 in effect gave it a statutorily granted claim against the state and by failing to comply with notice and hearing obligations Saturn was deprived of its right to due process.
I prefer to regard this claim from a different perspective. In effect the previous contention that the state delayed the arbitration process or that the arbitration process was inadequate to provide the necessary relief and this claim that the state violated the provisions of a contract it negotiated with Saturn provide the basis for a common argument. The argument is that injunctive relief is appropriate under the facts alleged here because by agreeing to the claims procedure set up on § 4-61 the state must be held to have impliedly waived its right to make a claim of sovereign immunity, cf Duguay v. Hopkins 191 Conn. 222, 228
(1983), Skinner v. Angiker 15 Conn. App. 297, 300 (1988). The very purposes of the statutory scheme, as previously defined, dictate that if in fact Saturn's interpretation of the contract is correct or if the state has unfairly delayed arbitration, Saturn as any other litigant can some into court and request the equitable relief it now demands.
How can it be said that this statutory scheme only gives a right to monetary relief not injunctive relief when failure to give injunctive relief in the appropriate case may defeat or inordinately delay the value or receipt of any purely monetary relief? The state needn't waive sovereign immunity or enter into many areas of our life and business but once it does it subjects itself and it agents to generally the same legal obligations as other citizens.
As noted above both as to the claim of state induced delay of arbitration and the interpretation of this contract there are serious factual disputes. But resolution of these disputes is enmeshed in the very question as to whether Saturn CT Page 10314 is entitled to the relief it requests.
At any hearing on this request for injunctive relief the state will be able to argue that in fact Saturn cannot show irreparable harm. It can try to show the limited request for relief will somehow interfere with the arbitration process or that if the court rules adversely to the state or regarding the termination of the contract the arbitrators will be illegally limited in the scope of their authority to make a decision. The State may seek to show that the asserted right to a hearing prior to contract termination will disrupt state contracting activity. It may seek to show by contract language or the industry practice regarding such language that Article 33 cannot be interpreted in the way Saturn contends it should be. It may even renew its sovereign immunity claim by establishing at a hearing that the judicial power to review the procedural validity of contract terminations if denied will have absolutely no effect on the integrity of the claims procedure under § 4-61 and in fact may interfere with it. It can try to show that the right of a party, here the State, to take advantage of its procedural rights in the arbitration process cannot be restricted by any court order which will have that result even if its actions may force companies out of business in certain situations.
What I don't think it can do is deprive a party like Saturn of the opportunity to show that all of the above is not true.[1]
(B.)
The previous discussion is based merely on an analysis of § 4-61 and what was felt to be the necessary implications of its passage on the question of whether injunctive relief is available. The previous discussion is thus not based on theHorton v. Meskill supra exception to the ambit of sovereign immunity — the governmental acts complained of are unconstitutional or unauthorized by statute, 172 Conn. at p. 624.
The plaintiff also raises the argument that the contract Saturn negotiated with the state gave it a constitutionally protected property interest because under its terms it could not be terminated without cause and the termination process is governed by the requirements of due process. CT Page 10315
Saturn bases its claim on an argument that under Article 33 of the contract it could only be terminated for certain circumscribed and delineated reasons. The contract provision according to Saturn created a reasonable expectancy that the contract would not be terminated absent these reasons — this is then a "clear entitlement" protected by due process. At a minimum Saturn argues that due process requires notice of the charges and an opportunity to be heard before its "property interest" could be terminated. Here Saturn did not receive due process protection.
In its reply brief of December 9, 1994 the State cites 22 cases standing for the proposition that contract disputes cannot be elevated to constitutional claims and all that is really involved here is a contract dispute.
From a procedural point of view query as to whether the state's claim is appropriately raised by a motion to dismiss. As said in Reitzer v. Board of Trustees of State Colleges2 Conn. App. 196, 201-02 (1984) by Justice Borden:
 In essence, the plaintiff claims that he has constitutionally protected interests in his reputation and his property, and that those interests were injured by the defendants' failure to hold a hearing on his request for continuation of his employment and to provide him with notice of the reasons for the denial of the request. . . . . . . . . . .The injury which he alleges for standing purposes, therefore, is the deprivation of his due process rights. Whether the plaintiff will be successful on a motion to strike or on the merits is immaterial to the issue of standing. The court's inquiry on the motion to dismiss should have focused, not on whether the plaintiff was entitled to notice and a hearing, but rather on whether he had standing to raise the issue of whether he was entitled to notice and a hearing.
Standing goes to the court's subject CT Page 10316 matter jurisdiction. . . . . Construing the first count of the complaint in a manner most favorable to the plaintiff, as we must; . . . . ; we conclude that the plaintiff has alleged sufficient facts to withstand the defendants' motion to dismiss. The cases cited by the defendants are inapposite because they were determined on the merits.
The plaintiff's allegations raise the claim that the State violated its due process rights and therefore sovereign immunity doesn't apply to bar its request to relief. This claim is inextricably bound up with the interpretation of the contract it advances so why shouldn't this matter and the state's sovereign immunity defense be raised by a motion to strike or in the hearing on the temporary injunction?
But turning to the merits I agree with the plaintiff's analysis. The cases cited by the defendant certainly stand for the proposition that contract disputes are not constitutional disputes. The defendant cites for example,Terminate Control Corp. v. Horowitz 28 F.3d 1335, 1351 (CA 2, 1994) but that very same Circuit recognized that a contract may create a constitutionally protected property right if (1) the contract creates and entitlement which can result from contract provisions permitting termination only for causeHotel Syracuse Inc. v. Young 805 F. Sup. 1073, 1084 (N.D.N.Y., 1992), and see that court's analysis of S D Maintenance Co.v. Golden 844 F.2d 962 (CA 2, 1988) and (2) The property right must be of a type accorded protection under the due process clause. There must be a revocation of the plaintiff's status, see Blackwell v. Mayor Commissioners of Delinar 841 F. Sup. 151,155-56 (DMd., 1993)
Terminate Control Corp. and S D Maintenance were cases where the courts did not reject the above principles but explicitly didn't apply them because the contractual relationship could be terminated without cause. A Aiudi Sons v. Town of Plainville 862 F. Sup. 737 (D Conn. 1994) cited by the State has no real bearing on the issues involved here. In fact Aiudi cited S D Maintenance in its general discussion which I consider authority supporting the plaintiff's position. CT Page 10317
As to the second prong necessary to establish a constitutional right, I believe the allegations made here support a right akin to the revocation of the plaintiff's status. Termination of this contract resulted (according to the allegations made) in Saturn losing its bonding and thus its right to compete for public construction jobs with local and state governments, including our state and its cities, see discussion in Blackwell at 841 F. Supp. page 156.
I agree with the defendant that ordinary contract claims should not be constitutionalized. For that very reason the Second Circuit applies a two pronged test to determine if a particular contract should form an exception to the salutary general rule. Based on the allegations made here I believe the plaintiff has satisfied that test.
There is therefore a due process property interest alleged. The question then becomes what due process was required before termination. Some form of notice and opportunity to be heard are required. Here the notice given really did not provide a factual basis for the termination relying as it did on Article 33C-F of the contract and there was no opportunity for a hearing, cf Logan v. Zimmerman BrushCo. 455 U.S. 422, 433 (1982), Cleveland Board of Education v.Loudermill 470 U.S. 532, 540 (1985), Signet Construction Co.v. Borg 775 F.2d 486, 490 (CA2, 1985). Minimal standards of due process were not met here if the allegations of Saturn are read in their most favorable light as I feel I must do for the purposes of this motion.
One further matter should be noted. It is true that in dicta the court in S D Maintenance did say at 844 F.2d page 966:
 And even if all public contract rights warranted the procedural protections of due process, there would be a substantial argument that in most circumstances post deprivation state court remedies would provide all the process that is due.
"Substantial argument" — "most cases", this doesn't have the ring of recognizing the right of trial courts to throw people and companies out of court without an opportunity to develop a factual record just because of the incantation of sovereign immunity. Whether post — deprivation relief and the CT Page 10318 timing of such relief will be adequate to protect Saturn's rights and even existence can only be established after a hearing on the merits. The motion to dismiss is denied.
Corradino, J.